666 A.2d 265

**Bonita Kline CURTIS**

v.

**Philip H. KLINE.**

**Appeal of COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE.**

Supreme Court of Pennsylvania.

Argued Sept. 21, 1995.

Decided Oct. 10, 1995.

250

Jason W. Manne, Pittsburgh, John A. Kane, Harrisburg, for Dept. of Public Welfare.

Kenneth C. Myers, Reading, for B. Curtis.

William Mitman, Jr., West Chester, for P. Kline.

Albert Momjian, Philadelphia, for Amicus.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

ZAPPALA, Justice.

In *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992), we declined to recognize a duty requiring a parent to provide college educational support because no such legal duty had been imposed by the General Assembly or developed by our case law. As a result of our *Blue* decision, the legislature promulgated Act 62 of 1993. Section 3 of the Act states:

> **(a) General rule.—** ... a court may order either or both parents who are separated, divorced, unmarried or otherwise subject to an existing support obligation to provide equitably for educational costs of their child whether an application for this support is made before or after the child has reached 18 years of age.

23 Pa.C.S. § 4327(a).

The issue now before us is whether the Act violates the equal protection clause of the Fourteenth Amendment of the

United States Constitution.[1] The Court of Common Pleas of Chester County held that it did, resulting in this direct appeal.[2]

The relevant facts are not in dispute. Appellee is the father of Jason, Amber and Rebecca. On July 12, 1991, an order of court for support was entered on behalf of Appellee's children. On March 2, 1993, Appellee filed a petition to terminate his support obligation as to Amber, a student at Kutztown University, and Jason, a student at West Chester University. After Act 62 was promulgated, Appellee was granted leave to include a constitutional challenge to the Act as a basis for seeking relief from post-secondary educational support.

In accordance with Pa.R.Civ.P. 235, the Attorney General was notified of the constitutional challenge to Act 62, but declined to participate in the litigation. On January 11, 1994, the trial court granted Appellee's petition to terminate support for Amber and Jason, concluding that Act 62 violated the equal protection clause of the Fourteenth Amendment of the United States Constitution. After Appellee's petition to modify his post-secondary education support obligation was disposed of, the Department of Public Welfare (DPW) sought and was granted leave to intervene. DPW then filed a notice of appeal to this Court.

The equal protection clause of the Fourteenth Amendment of the United States Constitution in pertinent part provides:

No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 436 A.2d 147 (1981).

1.  The Appellee did not assert that he was denied equal protection under our state constitution. We note, however, that we would apply the same analysis and reach the same result under our state constitution.

2.  42 Pa.C.S. § 741.

However, it does not require that all persons under all circumstances enjoy identical protection under the law. *James v. SEPTA*, 505 Pa. 137, 477 A.2d 1302 (1984). The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, *Robson v. Penn Hills School District*, 63 Pa.Cmwlth. 250, 437 A.2d 1273 (1981), and does not require equal treatment of people having different needs. *Houtz v. Commonwealth, Department of Public Welfare*, 42 Pa.Cmwlth. 406, 401 A.2d 388 (1979). The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, *Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237 (1922), provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. *Commonwealth v. Parker White Metal Co.*, 512 Pa. 74, 515 A.2d 1358 (1986). In other words, a classification must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of the legislation. *Id.*

Judicial review must determine whether any classification is founded on a real and genuine distinction rather than an artificial one. *Equitable Credit and Discount Company v. Geier*, 342 Pa. 445, 21 A.2d 53 (1941). A classification, though discriminatory, is not arbitrary or in violation of the equal protection clause if any state of facts reasonably can be conceived to sustain that classification. *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). In undertaking its analysis, the reviewing court is free to hypothesize reasons the legislature might have had for the classification. *Federal Communications Commission v. Beach Communications, Inc.; Martin v. Unemployment Comp. Bd. of Review*, 502 Pa. 282, 466 A.2d 107 (1983). If the court determines that the classifications are genuine, it cannot declare the classification void even if it might question the

soundness or wisdom of the distinction. *Equitable Credit and Discount Company v. Geier.*[3]

We are also mindful of the different types of classifications and the standards according to which they are weighed:

The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these. *Id.* Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

*Smith v. City of Philadelphia*, 512 Pa. 129 at 138, 516 A.2d 306 at 311 (1986) (citation omitted).

In this instance, we are satisfied that Act 62 neither implicates a suspect class nor infringes upon a fundamental right. Neither the United States Constitution nor the Pennsylvania Constitution provides an individual right to post-secondary education. The Pennsylvania Constitution provides only that, "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Article III, Section 14. Through the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 P.S. § 1–101 et seq., the General Assembly has established a statutory right to participate in public education and has established compulsory attendance requirements that in no case extend to post-secondary education. See 24 P.S. § 13–1301 and § 13–

3. We are also guided by the principle that a strong presumption exists that all legislation promulgated by the General Assembly is constitutional. 1 Pa.C.S. § 1922. See also *Federal Communications Commission v. Beach Communications, Inc.,* supra; *Plowman v. Commonwealth, Dpt. of Transportation,* 535 Pa. 314, 635 A.2d 124 (1993).

1326—13–1330. Apart from Act 62, there appears to be no expression of policy regarding an individual's "entitlement" to participate in post-secondary education.

Likewise, the classification does not implicate an important though not fundamental right.[4]  Consequently, Act 62 must be upheld if there exists any rational basis for the prescribed classification.  It is in this context that we review the Act's creation of a duty, and more significantly a legal mechanism for enforcement of that duty, limited to situations of separated, divorced, or unmarried parents and their children.

■  In applying the rational basis test, we have adopted a two-step analysis.  *See Plowman v. Commonwealth, Dpt. of Transportation,* 535 Pa. 314, 635 A.2d 124 (1993).  First, we must determine whether the challenged statute seeks to promote any legitimate state interest or public value.  If so, we must next determine whether the classification adopted in the legislation is reasonably related to accomplishing that articulated state interest or interests.

■  The preamble to Act 62 sets forth the legislature's intention "to codify the decision of the Superior Court in the case of Ulmer v. Sommerville, . . . and the subsequent line of cases interpreting Ulmer prior to the decision of the Pennsylvania Supreme Court in Blue v. Blue. . . ."  (Citations omitted).  It also states:

> Further, the General Assembly finds that it has a rational and legitimate governmental interest in requiring some parental financial assistance for a higher education for children of parents who are separated, divorced, unmarried or otherwise subject to an existing support obligation.

This latter statement begs the question of whether the legislature actually has a legitimate interest in treating children of separated, divorced, or unmarried parents differently than

---

**4.**  Appellee admits that in the court below both he and his ex-wife argued that a "rational basis" test should be applied.  He now argues that since the trial court addressed the applicability of a "heightened scrutiny" test, that argument should not be considered waived.  Since that issue was not raised before the trial court, we decline to address it.

children of married parents with respect to the costs of post-secondary education.

Appellant argues that with the passage of Act 62 the legislature may have chosen to treat the children of married families and divorced/unmarried families differently, not as a preference towards the latter, but out of deference to the Commonwealth's strong interest in protecting the intact marital family unit from governmental interference. Alternatively, Appellant argues that the legislature may have determined that children in non-intact or non-marital families require educational advantages to overcome disadvantages attendant to the lack of an intact marital family. The critical consideration is whether either of these bases or any other conceivable basis for distinction in treatment is reasonable.

Act 62 classifies young adults according to the marital status of their parents, establishing for one group an action to obtain a benefit enforceable by court order that is not available to the other group. The relevant category under consideration is children in need of funds for a post-secondary education. The Act divides these persons, similarly situated with respect to their need for assistance, into groups according to the marital status of their parents, i.e., children of divorced/separated/never-married parents and children of intact families.

It will not do to argue that this classification is rationally related to the legitimate governmental purpose of obviating difficulties encountered by those in non-intact families who want parental financial assistance for post-secondary education, because such a statement of the governmental purpose assumes the validity of the classification. Recognizing that within the category of young adults in need of financial help to attend college there are some having a parent or parents unwilling to provide such help, the question remains whether the authority of the state may be selectively applied to empower only those from non-intact families to compel such help. We hold that it may not. In the absence of an entitlement on the part of any individual to post-secondary education, or a generally applicable requirement that parents assist their

adult children in obtaining such an education,[5] we perceive no rational basis for the state government to provide only certain adult citizens with legal means to overcome the difficulties they encounter in pursuing that end.

It is not inconceivable that in today's society a divorced parent, e.g., a father, could have two children, one born of a first marriage and not residing with him and the other born of a second marriage and still residing with him. Under Act 62, such a father could be required to provide post-secondary educational support for the first child but not the second, even to the extent that the second child would be required to forego a college education. Further, a child over the age of 18, of a woman whose husband had died would have no action against the mother to recover costs of a post-secondary education, but a child over the age of 18, of a woman who never married, who married and divorced, or even who was only separated from her husband when he died would be able to maintain such an action. These are but two examples demonstrating the arbitrariness of the classification adopted in Act 62.

In *LeClair v. LeClair,* 137 N.H. 213, 624 A.2d 1350 (1993), the New Hampshire Supreme Court was faced with the issue of the constitutionality of a state statute regarding post-secondary educational support. Initially, it must be noted that the Court decided this appeal based upon the New Hampshire constitution even though the appellant contended that the statute denied him equal protection under both the federal and state constitution.

The underlying premise upon which the New Hampshire Supreme Court undertook its constitutional analysis of the post-secondary educational support scheme was that the legislation created two classifications: married parents and divorced parents. The object of the legislation was to protect children of divorced parents from being unjustly deprived of opportunities they would otherwise have had if their parents

---

**5.** Quaere whether the legislature could extend the statutory liability for support of children applicable to all parents, 23 Pa.C.S. § 4321(2), without regard to marital status, 23 Pa.C.S. § 4323(b), to include a duty to pay post-secondary education costs?

had not divorced. The statute was promulgated to ensure that children of divorced families are not deprived of educational opportunities solely because their families are no longer intact. The result is a heightened judicial involvement in the financial and personal lives of divorced families with children that is not necessary with intact families with children. The New Hampshire Supreme Court concluded that because of the unique problems of divorced families, the legislature could rationally conclude that absent judicial involvement, children of divorced families may be less likely than children of intact families to receive post-secondary educational support from both parents.

With all due respect to our sister state, we must reject the New Hampshire Supreme Court's analysis in *LeClair*. The discriminatory classification adopted by our legislature is not focused on the parents but rather the children. The question is whether similarly situated young adults, i.e. those in need of financial assistance, may be treated differently.[6]

Ultimately, we can conceive of no rational reason why those similarly situated with respect to needing funds for college education, should be treated unequally. Accordingly, we agree with the common pleas court and conclude that Act 62 is unconstitutional.

The Order is affirmed.

MONTEMURO, J.,* files a Dissenting Opinion in which Mr. Justice Cappy joins.

MONTEMURO, Justice, dissenting.

I must dissent.

As the Majority correctly points out, the rational basis test to determine whether a statute is constitutional requires, first, a determination of whether the challenged legislation seeks to promote any legitimate state interest. It must then be decided whether the statute bears a reasonable relationship to the

---

**6.** See also *Childers v. Childers*, 89 Wash.2d 592, 575 P.2d 201 (1978), and *Neudecker v. Neudecker*, 577 N.E.2d 960 (Ind.1991).

* Mr. Justice MONTEMURO is sitting by designation.

intended objective. *Commonwealth v. Parker White Metal Company*, 512 Pa. 74, 515 A.2d 1358 (1986). However, "the Constitution does not require situations 'which are different in fact or opinion to be treated in law as though they were the same.'" *Wells v. Civil Service Commission*, 423 Pa. 602, 604, 225 A.2d 554, 555 (1967) *cert. denied*, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (quoting *Goesaert v. Cleary*, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948)). Indeed, a statute will not be ruled constitutionally invalid under this test "unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest." *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). The Majority challenges not merely the means of execution, but the legitimacy of the government interest which the statute is expressly designed to promote.

Act 62 is directed at furthering the education of the citizens of this Commonwealth. It operates on the assumption that divorce necessarily involves a disadvantage to the children of broken families, and is intended to assure that children who are thus disadvantaged by the divorce or separation of their parents are not deprived of the opportunity to acquire post secondary school education. In effect, it attempts to maintain the children of divorce in the same position they would have been in had their parents' marriage remained intact. The Act is not intended to, nor does it, place a premium on the rights of children of divorce while devaluing the same rights for children from intact marriage. It merely recognizes that, in general, divorce has a deleterious effect upon children, which should, insofar as is possible, be redressed. Thus while constitutional principles permit this intended result, a "difference in fact or opinion" recognized by the Legislature as within its purview, the Majority has declared that, at least for college age children, the distinction between the children of broken families and those of intact families simply does not exist.

In rejecting the authenticity of the premise underlying the statute, the Majority also challenges the validity of the legislative interest. It contends that the expressed intention of the

statute "will not do" because the Legislature actually has no legitimate interest in treating children of broken marriages differently than children of intact marriages. The Majority theorizes that since the children of intact families may be no less in need of funds for purposes of higher education, they are situated similarly to children of divorced or separated parents, and any distinction between them is inconsequential.

It would be difficult to argue successfully that the payment of child support is, in general, an obligation freely acknowledged and willingly undertaken by non-custodial parents. The extraordinary amount of time, attention and money devoted by courts, government agencies and legislatures to fashioning and enforcing support orders is testament to the unfortunate fact that the opposite is true.[1] Moreover, the impact of parental non-compliance with support orders on children in need of basic necessities is obvious, hence the stated purpose of the Support Guidelines is to provide for children's reasonable needs which might, and frequently do, absent enforcement of established orders, otherwise go unmet.[2]

It has also been widely acknowledged that among the negative effects of divorce on children are those which concern higher education. *See e.g.,* Smyer and Cooney, Family Relations Across Adulthood: Implications for Alimony and Child Support Decisions, American Bar Association National Symposium on Alimony and Child Support (Apr. 24–25, 1987); Wallerstein and Corbin, "Father Child Relationships After Divorce; Child Support and Educational Opportunity, 20 FAM. L.Q. 109 (1986). · Courts faced with cases similar to the one at bar have also noted, over and over again, that in divorce, the normative rules of behavior may no longer apply. *Ex Parte*

1. In fiscal year 1994, Pennsylvania expended over $100,000,000 · to collect over $840,000,000 through the Child Support Enforcement Program, using various mechanisms such as wage attachment. Of these collections, more than $713,000,000 was distributed to non-AFDC families. (Ranking of Region III States Child Support Enforcement, Fiscal Year 1994)

2. Nationally, of the $16.3 billion due under court orders in 1993, about $11.2 was actually paid, with only about half of those awarded support receiving the full amount. (Child Support Enforcement, Eighteenth Annual Report to Congress)

*Bayliss,* 550 So.2d 986 (Ala.1989); *Kujawinski v. Kujawinski,* 71 Ill.2d 563, 17 Ill.Dec. 801, 376 N.E.2d 1382 (1978); *Neudecker v. Neudecker,* 577 N.E.2d 960 (Ind.1991); *Vrban v. Vrban,* 293 N.W.2d 198 (Iowa 1980). Whether because they lose concern for their children's welfare, or out of animosity toward the custodial parent, non-custodial parents frequently become reluctant to provide financial support for any purpose, but are particularly determined to avoid the costs of a college education. *Childers v. Childers,* 89 Wash.2d 592, 575 P.2d 201 (1978). Then the custodial parent, who typically has less money than the non-custodial parent, most often becomes the de facto bearer of most, if not all, of the burden of educational expenses, even where the non-custodial parent possesses both resources and background which would inure to the child's benefit were the parents still married. L. Weitzman, *The Divorce Revolution* 278 (1985). Such parents, are, in addition, even less inclined to assist with the educational expenses of daughters than of sons. Smyer and Cooney, *supra,* and Wallerstein, *supra. See also,* S.F. Goldfarb, "A Model for Fair Allocation of Child Support," 21 FAMILY L.Q. (Fall 1987).

The courts addressing the issue have uniformly decided that equal protection is not offended by an attempt to equalize the disparate situation faced by children of divorce. Only the means are different. Those facing challenges to a statutory provision have all found that the differences between married and divorced parents establishes the necessity to discriminate between the classes, e.g., *Childers; Vrban.* Others, in examining judge-made law found an extended dependency justified court intervention. They all, however, delegated to the court the authority to determine the propriety of an award.

In *LeClair v. LeClair,* 137 N.H. 213, 624 A.2d 1350 (1993), the New Hampshire Supreme Court recognized and addressed the very concerns toward which Act 62 is directed—the disadvantage wrought on children by divorce of their parents, and the necessity for court intervention to protect them from the consequences of this disadvantage. The New Hampshire statute, RSA 458:20, codified decisions in which the New Hamp-

shire Supreme Court had recognized the jurisdiction of the superior court to order divorced parents, consistent with their means, to contribute toward the educational expenses of their college age children.[3]   Challengers of the statute bore the burden of showing that the court had committed an abuse of discretion, and that the order was "improper and unfair." *Id.* at 221, 624 A.2d at 1355.   The equal protection argument focused on the parents, finding them similarly situated with respect to the issue.   However, the Majority here states that because the focus of Act 62 is the treatment of children, the marital status of their parents is irrelevant.[4]

This argument is specious,[5] since *any* child support legislation necessarily involves the marital status of the parents. Intact families do not suffer intervention by the courts unless their children are abused or neglected.   Recognition of the need for legislative or judicial action to require support for children of broken families is irrefutable, as the continuing governmental efforts to improve collection of support attest. It is unrealistic to conclude, as the Majority does, that merely because children are in need of funds for college rather than subsistence, the effect of their parents marital status has

3.   The intention of Pennsylvania's Legislature in enacting 23 Pa.C.S.A. § 4327 was precisely the same as that of New Hampshire.   Passage of Act 62 was a legislative effort to codify thirty years worth of caselaw which began with the Superior Court decision in *Ulmer v. Sommerville,* 200 Pa.Super. 640, 190 A.2d 182 (1963), and ended with this Court's decision in *Blue v. Blue,* 532 Pa. 521, 616 A.2d 628 (1992).   *See,* Historical and Statutory Notes.

4.   What these assumptions imply is that regardless of the need involved, food, clothing and medical care, or higher education, children qua children are always on an equal footing since they are always in need of parental financial support.   Thus, following the Majority's logic, any legislation which distinguishes between children on the basis of their parents' marital status is constitutionally suspect, e.g., any law requiring support from parents no longer living in an intact marriage, or never having been in such a marriage.

5.   As the Amicus points out, there is real question whether Appellee herein possesses standing to contest the supposedly unequal treatment meted out to children by the statute.   Moreover, the pleadings filed by Appellee clearly establish himself as the party receiving unequal treatment.   (Defendant's Amendment to Petition to Modify, Para. 6.a.i.) Arguably, therefore, the pivot point of the Majority's argument is not properly before this Court.

magically altered, and that enforcement of an obligation is no longer necessary.

What must be remembered, and what the Majority fails to explore, is that Act 62 does not make mandatory the directive to pay child support for college. Section 4327(e) [6] lists standards to assist the court in determining whether or not support is appropriate. Unless these criteria are, in the estimation of the court, met by the parties, no liability exists.

The problem lies with the nature of the liability, which is, quite simply, a moral duty, circumstantially prescribed. Under Act 62, it is owed only by parents who are subject to an existing support obligation, that is, they have acknowledged either voluntarily through contract, or involuntarily through the necessity of court order that a financial responsibility to pay for their children's upkeep exists. The court has thus already become involved to the extent of entering an order, or there exists another legal mechanism, e.g., separation agreement, through which enforcement can be accomplished and contribution monitored. In intact families, absent abuse or neglect, no such initial intervention has occurred, and the court has no forum in which to enforce a duty imposed on these parents. *Compare, Reeves v. Reeves,* 584 N.E.2d 589 (Ind.App.1992). Moreover, limitations have been placed on the ability to control children's education by legislative fiat.

**6.** 23 Pa.C.S.A. § 4327(e)

(e) **Other relevant factors.**—After calculating educational costs and deducting grants and scholarships, the court may order either parent or both parents to pay all or part of the remaining educational costs of their child. The court shall consider all relevant factors which appear reasonable, equitable and necessary, including the following:

(1) The financial resources of both parents.

(2) The financial resources of the student.

(3) The receipt of educational loans and other financial assistance by the student.

(4) The ability, willingness and desire of the student to pursue and complete the course of study.

(5) Any wilful estrangement between the parent and student caused by the student after attaining majority.

(6) The ability of the student to contribute to the student's expenses through gainful employment. The student's history of employment is material under this paragraph.

(7) Any other relevant factors.

*See, Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (state cannot compel school attendance beyond eighth grade where family's religious beliefs are compromised); *Pierce v. Society of Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (state could not compel public school attendance for all children between the ages of 8 and 16); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (state could not prohibit teaching of German language). Thus intervention in the form of a statute requiring parents of an intact marriage to finance their children's college education would indeed infringe upon the constitutional/privacy right of the parties.

While it does not necessarily follow that in all cases children of divorce are deprived of parental support for college, or that the reverse is true and all children of intact families are provided with the necessary encouragement and finances, children whose parents are still married most often continue to receive support past majority.[7] Equal protection does not demand that every permutation be addressed separately, what is sought is equality not uniformity.

It cannot successfully be argued that the state has no legitimate interest in furthering the education of its citizens. The size of the state university system, the multiplicity of community colleges and other educational programs designed to provide low cost post-secondary training, all attest to the state's involvement with the goal of bettering the information and functioning level of the attendees. Clearly the Majority accepts this focus, hence its query as to whether the statute would be acceptable were it only altered to require all parents to contribute to the post-secondary educational expenses of their children. However, as noted above, this kind of government mandated action is constitutionally untenable when applied to intact families.

Conventional wisdom once dictated that divorced parents will interact with their children in the same manner as they did during the life of the marriage. Experience has dictated

7. R. Washburn, "Post–Majority Support: Oh Dad Poor Dad," 44 TEMPLE L.Q. 319, 329 n. 55 (1971).

otherwise,[8] viz., the widespread need for enforcement of court ordered support even from parents for whom compliance is not an economic hardship. It is, after all, these parents at whom Act 62 is aimed. Divorce modifies parental behavior in ways which cannot always be anticipated. To ignore the reality of these differences, and the impact necessarily produced upon the children is shortsighted, as the educational achievements of the next generations are critical to the success of this country in an increasingly competitive world.

The law need not, and should not, change direction to comport with every change in the prevailing social winds. Nor is it designed to redress every psychological and emotional ill which trails in the wake of divorce. However, principles of justice require an unwavering commitment to the protection of the weakest members of our society, our children. Refusal to recognize their weakness breaches the social compact, and violates the basic principles of fairness the law is intended to uphold. Given the consequences of divorce, to deprive children of broken marriages of the economic support which they would normally receive from nuclear families is to deny them equal protection. As the court in *Childers, supra,* noted, the imposition of a burden of support does establish a classification with discriminatory obligations. However, rather than an arbitrary, unreasonable or unjust classification, there is instead a collection of special powers in equity that the courts, regardless of legislation, have long used to protect the children of broken homes. *Id.* at 604, 575 P.2d at 208. The disadvantage exists; it cannot be ignored or wished away.

If the Majority's view prevails, there is no recourse for these children, who will be victimized twice, first by the disruptions, both financial and psychological, of their parents' divorce, and again by the system which is theoretically designed to protect them. Moreover, such a course will not benefit the children of intact marriages in which, because of a

8. One national study reports that 40% of children are not visited by their non-custodial parents. Frank F. Furstenberg, S. Philip Morgan, and Paul D. Allison, "Paternal Participation and Children's Well–Being After Marital Dissolution," AMERICAN SOCIOLOGICAL REVIEW 52 (1987): 695–701.

parental disinterest in education or a view that non-support encourages the work ethic, the parents will also refuse to assist their children. The result will be no improvement for anyone.

Once the moral imperative which should motivate parents to fulfill their obligations has dissipated, conscious effort by the state must provide a substitute where it is able to do so. That is what the Legislature wisely has done. By disregarding the rational basis advanced for Act 62, the Majority now transforms this Court into a super-Legislature.

Accordingly, I dissent.

CAPPY, J., joins in this dissenting opinion.