899 A.2d 1085 (2006)
PENNSYLVANIA TURNPIKE COMMISSION,
v.
COMMONWEALTH of Pennsylvania, Attorney General of Pennsylvania, and Pennsylvania Labor Relations Board, and International Brotherhood of Teamsters AFL-CIO, Local 30,
Appeal of International Brotherhood of Teamsters AFL-CIO, Local 30.
Supreme Court of Pennsylvania.
Argued March 2, 2006.
Decided June 19, 2006.
*1086 Ernest B. Orsatti, Esq., Pittsburgh, for International Brotherhood of Teamsters ALF-CIO, Local 30.
John Patrick McLaughlin, Esq., Marjorie A. George, Esq., H. Thomas Felix, II, Esq., Philadelphia, for Pennsylvania Turnpike Commission.
Amanda L. Smith, Esq., for Attorney General Office, Commonwealth of PA.
Warren R. Mowery, Esq., for Pennsylvania Labor Relations Board.
BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

OPINION
Justice CASTILLE.
In the case sub judice, we are asked to decide whether the Commonwealth Court was correct in holding that the First-Level Supervisor Collective Bargaining Act, 43 *1087 P.S. §§ 1103.101-1103.701 (the "Act"), violates Article III, Section 32 of the Pennsylvania Constitution and therefore is unconstitutional. The Act applies to a single public employer: appellee Pennsylvania Turnpike Commission (the "Commission") and mandates collective bargaining with the Commission's first-level supervisors. For the following reasons, we agree that the Act is unconstitutional special legislation. Accordingly, we affirm the Commonwealth Court.
Prior to adoption of the Act, the relationship between the Commission and its first-level supervisors was governed by the Public Employee Relations Act ("PERA"), 43 P.S. §§ 1101.101-1101.2301. Although Section 1101.401 of PERA permits collective bargaining between public employees and public employers generally,[1] Section 1101.704 specifically exempts first-level supervisors from that construct. See 43 P.S. § 1101.704 ("Public employers shall not be required to bargain with units of first level supervisors or their representatives but shall be required to meet and discuss with first level supervisors or their representatives, on matters deemed to be bargainable for other public employes covered by this act.").[2] First-level supervisors under PERA are also not given the right to strike. See Curley v. Bd. of Sch. Dirs. of Greater Johnstown Sch. Dist., 163 Pa.Cmwlth. 648, 641 A.2d 719, 725 (1994).
As originally proposed in the Pennsylvania House of Representatives, the Act, which was then entitled the "Public Employee First-Level Supervisor Collective Bargaining Act," would have mandated collective bargaining between public employers and their first-level supervisors. H.R. 2183, November 20, 2001, Printer's No. 2934, 186th Gen. Assem., Reg. Sess., Sections 102, 301 (Pa.2002). The initial version of the Act defined the term "public employer" in broad terms that were materially identical to PERA's broad definition of public employer:
The Commonwealth, its political subdivisions including school districts and any officer, board, commission, agency, authority or other instrumentality thereof and any nonprofit organization or institution and any charitable, religious, scientific, literary, recreational, health, educational or welfare institution receiving grants or appropriations from Federal, State or local governments but shall not include employers covered or presently subject to coverage under the National Labor Relations Act (49 Stat. 449, 29 U.S.C. § 151 et. seq.) and the act of June 1, 1937 (P.L. 1168, No. 294), known as the Pennsylvania Relations Act.
*1088 Id. at Section 103.[3] The original version of the Act also included a "Declaration of Policy" which was similar to the legislative policy animating PERA:
It is the public policy of this Commonwealth and the purpose of this act to promote orderly, constructive and harmonious relationships between first-level supervisors and their public employers subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between public employers and first-level supervisors are injurious to the public and the current meet and discuss rights of the first-level supervisors provided by the Act of July 23, 1970 (P.L. 563, No. 195), known as the Public Employe Relations Act, do not provide a meaningful or enforceable method of resolving disputes. The General Assembly has determined that the overall policy may best be accomplished by requiring public employers to negotiate and bargain with employee organizations representing first-level supervisors and to enter into written agreements evidencing the result of such bargaining.
Id. at Section 101.[4]
Following referral to the House Labor Relations Committee, the Act was amended. Among other things, the Committee deleted the following from the definition of "public employer": "and any nonprofit organization or institution and any charitable, religious, scientific, literary, recreational, health, educational or welfare institution receiving grants or appropriations from Federal, State or local governments." H.R. 2183, December 12, 2001, Printer's No. 3092, 186th Gen. Assem., Reg. Sess., Section 103 (Pa.2002). The Act was then referred to the House Appropriations Committee which, inter *1089 alia, deleted the "declaration of policy" section, modified the short title of the Act to its current title of "First-Level Supervisor Collective Bargaining Act" and replaced the previous, expansive definition of "public employer" with "The Pennsylvania Turnpike Commission." H.R. 2183, June 11, 2002, Printer's No. 4012, 186th Gen. Assem., Reg. Sess. (Pa. 2002). After one further amendment, the Act was passed by the House of Representatives on June 12, 2002. H.R. 2183, June 12, 2002, Printer's No. 4019, 186th Gen. Assem., Reg. Sess. (Pa.2002). The Act was then moved to the Senate; referred to the Senate Labor and Industry Committee, which made nominal amendments, see H.R. 2183, November 19, 2002, Printer's No. 4638, 186th Gen. Assem., Reg. Sess. (Pa.2002); and passed on November 26, 2002. On November 27, 2002, the Act was signed in the House of Representatives and the Senate. The Act was approved and signed by the Governor on December 9, 2002, and was effective immediately. Act of Dec. 9, 2002, P.L. 1399, No. 174.
In contrast to PERA, the Act as adopted now mandates that the single public employer to whom it applies, the Turnpike Commission, see 43 P.S. § 1103.102, collectively bargain with its first-level supervisors:
It shall be the duty of the public employer and employee organizations representing first-level supervisors to settle all disputes by engaging in collective bargaining in good faith and by entering into settlements by way of written agreements and maintaining of the same.
Id. at § 1103.301. The Act's definitions of first-level supervisor and supervisor are materially identical to the definitions of those terms contained in PERA. Thus, a "first-level supervisor" is defined as "an employee functioning at the lowest level as a supervisor," and a "supervisor" as:
Any individual having authority in the interests of the employer to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employees or responsibility to direct them or adjust their grievances, or to a substantial degree effectively recommend such action if, in connection with the foregoing, the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment.
Id. at § 1103.102.[5] Furthermore, under the Act, first-level supervisors are not permitted to strike. Id. at § 1103.401. In lieu of striking, the Act provides for binding arbitration when an impasse is reached. See id. at § 1103.303(1).
On January 6, 2003, Ernest P. Gigliotti, president of the International Brotherhood of Teamsters, AFL-CIO, Local 30 ("Local 30"), acting as representative of the Commission's first-level supervisors, requested that the Commission engage in collective bargaining. The Commission responded that it was not required to commence negotiations with Local 30 until six months before the start of the Commission's fiscal year.[6] Thereafter, on September 25, 2003, the Commission petitioned for review in the Commonwealth Court. The Commission sought declaratory judgment and injunctive relief to stay implementation *1090 of the Act, alleging that it was an unconstitutional special law in violation of Article III, Section 32, of the Pennsylvania Constitution.[7] In response, Local 30, the Pennsylvania Office of Attorney General and the Pennsylvania Labor Relations Board filed separate answers. The Commission then filed an application for a special and preliminary injunction on March 9, 2004 seeking a stay of enforcement of the Act pending resolution of its constitutionality. Following a March 17, 2004 hearing before the Honorable Dan Pellegrini, the court ordered the Commission to file a motion for summary judgment, deferred action on the motion for a preliminary injunction pending the Court's disposition of the Commission's motion for summary judgment, and scheduled argument for May 3, 2004. On March 24, 2004, the Commission filed a motion for summary judgment, again arguing that the Act violated Article III, Section 32, as a special law, and asserted the additional contention that the Act was unconstitutional per se because it contained a class of one.[8] Local 30 then countered with its own motion for summary judgment on April 26, 2004, arguing that the Act was constitutional.
Following argument, a panel of the Commonwealth Court issued a published opinion on July 30, 2004, authored by the Honorable Bernard L. McGinley, which granted the Commission's motion for summary judgment and denied Local 30's summary judgment motion. Pa. Turnpike Comm'n v. Commonwealth, 855 A.2d 923 (Pa.Cmwlth.2004). In examining whether the Act constituted an impermissible special law in violation of Article III, Section 32, the panel looked to the test this Court stated in Curtis v. Kline, 542 Pa. 249, 666 A.2d 265, 269 (1995), i.e., "whether the challenged statute seeks to promote any legitimate state interest or public value," and if so, "whether the classification adopted in the legislation is reasonably related to accomplishing that articulated state interest or interests." The panel noted that the Commission had conceded that a legitimate state interest could be found if the Act fostered meaningful labor relations between the Commission and its first-level supervisors, but the Commission argued that such a policy argument applied equally to the Turnpike Commission as well as to other public employers. Thus, the Commission maintained that the Act failed the second prong of the Curtis test because there was no rational reason to treat the Commission differently from all other public employers. Pa. Turnpike Com'n, 855 A.2d at 926.
The panel agreed with the Commission, in the process finding particularly persuasive this Court's reasoning in DeFazio v. Civil Service Commission of Allegheny County, 562 Pa. 431, 756 A.2d 1103 (2000). The statute at issue in DeFazio required sheriffs of counties of the second class to abide by particular hiring and promotion procedures and limited the political activities of those sheriffs' employees. 756 A.2d at 1104. The DeFazio Court held that the *1091 statute created a new sub-classification that had no rational relationship to accomplishing a legitimate state interest, and therefore, held that the statute was unconstitutional as violative of Article III, Section 32. Id. at 1106. Analogizing this case to DeFazio, the panel below held that there is "no rational reason to treat first-level supervisors of the Commission differently from first-level supervisors employed by any other public employer," and therefore, the Act violated Article III, Section 32. In light of its conclusion, the panel did not address the Commission's alternative argument that the Act was unconstitutional per se. Pa. Turnpike Comm'n, 855 A.2d at 927 & n. 9.
On appeal to this Court, Local 30 argues that the Commission did not meet its burden of demonstrating that the Act, which is presumed to be constitutional, clearly, palpably and plainly violates the Constitution. Local 30 maintains that the Act is rationally related to the General Assembly's plan to address the inadequacies of PERA's "meet-and-discuss" procedure on an incremental basis, and is proper because the Commission's first-level supervisors' job duties are closely related to the health, safety and welfare of the public traveling on the turnpike. Local 30 claims that "[e]xtending collective bargaining and arbitration rights to the first level supervisors of the Commission protects the free flow of travel and commerce throughout the Commonwealth of Pennsylvania from interruption due to unresolved labor disputes." Appellant's Brief at 30.[9]
Local 30 also submits that the Act does not treat other, similarly situated public employers differently than the Commission because there are no other similarly situated public employers. In Local 30's view, the Commission is a unique class of one because there is only one turnpike system in Pennsylvania and only one Turnpike Commission. In addition, Local 30 argues that the Commission is unique in that it is a fiscally independent agency of the Commonwealth; therefore, the economic impact of the Act would fall upon the Commission only, and not upon the Commonwealth's coffers generally. This fact, in Local 30's view, makes the Commission an appropriate entity for experimentation with an alternative to PERA's meet and discuss procedures. Local 30 therefore argues that the Act cannot be considered special legislation.
Local 30 also stresses that the General Assembly has afforded other publicly employed first-level supervisors in the Commonwealth the right to collectively bargain-namely, first-level supervisors of the Port Authority of Allegheny County, 55 P.S. § 563.2, and City of Philadelphia school administrators, 71 P.S. § 371. Local 30 argues that the current Act merely extends those same rights to another group of first-level supervisors-those employed by the Commission. Local 30 characterizes the Act's extension of collective bargaining rights as a "step-by-step" approach or pilot program, akin to the pilot program that this Court found to be constitutional in Harrisburg School District v. Zogby, 574 Pa. 121, 828 A.2d 1079 (2003). Thus, in Local 30's view, the Act merely advances another step toward the General Assembly's ultimate goal of affording collective bargaining rights to all first-level public supervisors.
Finally, Local 30 argues that the Act cannot be deemed unconstitutional per se because "there is no such thing" as a per se unconstitutional statute. Local 30 submits *1092 that the references this Court has made to statutes being unconstitutional per se have been dicta because in all cases where a statute has been found unconstitutional as special legislation, this Court has looked to (and found) that there was no rational relationship between the classification and the object of the legislation. Local 30 asserts that there is no case from this Court where the discussion of per se unconstitutionality was necessary to the decision. Local 30 also claims that federal law does not recognize a per se approach to equal protection analysis. Local 30 further argues that the Commission's "class of one" argument fails because "classification does not depend on numbers." In any event, Local 30 claims that the Act does not create a closed class of one because another Pennsylvania Turnpike Commission theoretically could be created at a later time.
The Commission responds that the Act is a classic example of a special law prohibited by Article III, Section 32. By defining "public employer" exclusively as "The Pennsylvania Turnpike Commission," the Commission notes that the Act singles out the Commission from all other public employers of first-level supervisors. The Commission contends that the Act's treatment of the Commission differently from all other public employers, some of whom perform similar types of work, is what Article III, Section 32 was intended to prevent. The Commission notes that this Court has found similar acts unconstitutional under Article III, Section 32. See, e.g., DeFazio, supra; Harrisburg Sch. Dist. v. Hickok, 563 Pa. 391, 761 A.2d 1132 (2000) (hereinafter "Hickok I"). Thus, the Commission maintains that although statutes duly enacted by the General Assembly are presumed to be valid, where there is a clear constitutional violation, courts of this Commonwealth have not hesitated to declare the statute unconstitutional.[10]
The Commission further contends that, even assuming there is a rational purpose behind the Act, that purpose cannot save it in the face of the special legislation challenge because the Act's classification and disparate treatment of the Commission are not rationally related to the purpose. The Commission maintains that the clearest proof that the Act is a special law is to compare the original version of the Act, which would have applied to all first-level supervisors of virtually all public employers, to the final version, which reduced the definition of "public employer" to a single entity, the Commission.
The Commission also disputes Local 30's argument that there is something distinctive or unique about the Commission that warrants the special and different treatment mandated in the Act. The Commission claims that its first-level supervisors are not responsible for the actual work on the Pennsylvania Turnpike, and thus, the special treatment mandated here is not necessary to ensure the free flow of travel and commerce throughout the Commonwealth. Indeed, if the General Assembly was genuinely concerned with labor disputes that could disrupt the turnpike's operation, the Commission argues, it would have addressed labor relations with rank-and-file Commission employees, not the tiny class of first-level supervisors. The Commission argues that, because there is no rational reason to treat it differently from every other public employer in the Commonwealth, it met its heavy burden and established that the Act is unconstitutional, *1093 and the Commonwealth Court properly so held.
Additionally, the Commission contests Local 30's claim that special legislation of this sort may be deemed acceptable if it is part of an incremental, step-by-step approach or a pilot program ultimately designed to provide collective bargaining rights to all first-level public supervisors. The Commission notes that the legislation that extended collective bargaining rights to first-level supervisors with the Allegheny County Port Authority[11] and to City of Philadelphia school administrators[12] is distinguishable from the Act sub judice. This is so because the classes governed by those prior Acts are open as the legislation is specific to second-class and first-class counties, respectively, and not to the Allegheny County Port Authority or to the City of Philadelphia School District specifically. Those county class-based legislative classifications potentially could expand; whereas here, in contrast, the existing legislative classification can never have more than one member-the Commission. Additionally, the Commission notes that any attempt to excuse this special legislation under an "incremental approach" theory is absurd because the Port Authority Act was enacted in 1986, the School Administrators Act was enacted in 1996 and this Act was passed in 2002. At this rate, the Commission notes, this supposed incremental program could take hundreds of years to implement.
In any event, and more fundamentally, the Commission argues that there is no pilot program exception to the clear prohibition of Article III, Section 32. The Commission notes that there was/is no pilot program language in the initial or the final version of the Act, a fact which distinguishes this case from the legislation which was deemed constitutional in Zogby. Furthermore, the Commission notes that in Zogby, this Court flatly stated that, "Article III, Section 32 does not have a `pilot program exception.' The relevant inquiry, however, is not whether such an exception exists, but whether the particular pilot program here at issue constitutes special legislation." Zogby, 828 A.2d at 1091 n. 16 (Pa.2003). Therefore, the Commission argues that even if the Act could be construed as a pilot program, that fact would not render it immune from a valid Article III, Section 32 challenge.
In the alternative, the Commission renews its claim that the Act is unconstitutional per se because it creates a blatantly closed class. The Commission challenges Local 30's characterizations of this Court's discussions in prior cases concerning per se unconstitutionality as mere "passing references" or dicta. The Commission notes that this Court has stated that "a classification of one member is not unconstitutional so long as other members might come into that class." Appellee's Brief at 11-12, quoting Harristown Dev. Corp. v. Commonwealth, Dept. of General Serv., 532 Pa. 45, 614 A.2d 1128, 1132 n. 9 (1992) (citing Haverford Township v. Siegle, 346 Pa. 1, 28 A.2d 786, 789 (1942)). The logical corollary of that holding, the Commission argues, is that legislation is per se unconstitutionally special legislation where one member is categorized and no others can come into the class. The Commission cites this Court's decisions in Hickok I and Zogby as further examples of cases which explicitly recognized that a statute which creates an immutable class of one is per se unconstitutional. Applying this line of authority, the Commission notes that the Act in the case sub judice is expressly applicable to but one public employer  the Commission *1094  and thus it is unconstitutional per se. The Commission characterizes as "absurd" Local 30's argument that a second and redundant Pennsylvania Turnpike Commission could be created and also notes, in any event, that this legislation employs a definite article  i.e., the Act applies to "the" Pennsylvania Turnpike Commission, thus defining a single entity. Any subsequent Commission, by definition, would not be "the" single existing Commission referred to in this legislation.
A challenge to the constitutionality of legislation poses a question of law, and thus, our review is plenary and non-deferential. See Zogby, 828 A.2d at 1088; Purple Orchid, Inc. v. Pa. State Police, 572 Pa. 171, 813 A.2d 801, 805 (2002); Pa. Sch. Bds. Ass'n v. Commonwealth Ass'n of Sch. Adm'rs, Teamsters Local 502, 569 Pa. 436, 805 A.2d 476, 479 (2002). There is a presumption that legislation duly enacted by the General Assembly is valid and will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. See Commonwealth v. Mockaitis, 575 Pa. 5, 834 A.2d 488, 497 (2003); Purple Orchid, 813 A.2d at 805; Commonwealth v. Cotto, 562 Pa. 32, 753 A.2d 217, 219 (2000). See also 1 Pa.C.S. § 1922(3). Thus, the party challenging the constitutionality of a statute bears a heavy burden of persuasion. See Zogby, 828 A.2d at 1087-88; Commonwealth, Dept. of Transp. v. McCafferty, 563 Pa. 146, 758 A.2d 1155, 1160 (2000); DeFazio, 756 A.2d at 1105.
Pennsylvania's proscription against local or special laws is currently found in Article III, Section 32, and was first adopted in the Pennsylvania Constitution of 1874. Like many constitutional provisions, it was adopted in response to immediate past abuses.[13] The main purpose behind Article III, Section 32 was "to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873." Haverford Township, 28 A.2d at 788. Over the years, the underlying purpose of Article III, Section 32 has been recognized to be analogous to federal principles of equal protection under the law, see U.S. Const. amend. XIV, § 1, and thus, special legislation claims and equal protection claims have been reviewed under the same jurisprudential rubric. See Zogby, 828 A.2d at 1088; DeFazio, 756 A.2d at 1105-06.[14] The common constitutional principle at the heart of the special legislation proscription and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign. Kramer v. Workers' Compensation Appeal Bd. (Rite Aid Corp.), 584 Pa. 309, 883 A.2d 518, 532 (2005); Probst v. Commonwealth, Dept. of Transp., Bureau of Driver Licensing, 578 Pa. 42, 849 A.2d 1135, 1143 (2004); Commonwealth v. Albert, 563 Pa. 133, 758 A.2d 1149, 1151 (2000). Nonetheless, it is settled that equal protection principles do not "vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community," nor do these principles "prohibit differential treatment of persons having different needs." *1095 Zogby, 828 A.2d at 1088. As this Court explained in Curtis:
The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation.
Curtis, 666 A.2d at 268 (citations omitted). Thus, there are a legion of cases recognizing that a legislative classification which appears to be facially discriminatory may nevertheless be deemed lawful if the classification has a rational relationship to a legitimate state purpose.[15] Furthermore, as this Court noted in Hickok I, legislative classifications must be founded on "real distinctions in the subjects classified and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition." 761 A.2d at 1136 (quotation omitted). Finally, in analyzing a special legislation/equal protection challenge, a reviewing court is free to hypothesize reasons the General Assembly might have had for the classification of certain groups. Zogby, 828 A.2d at 1089.
The legislation in this case draws a distinction, for purposes of labor relations, between first-level supervisors who work for the Commission and all other first-level governmental supervisors who might be covered by such a law (i.e., persons who now are still covered by PERA's meet and discuss provision). The version of the Act which was adopted does not contain an explanation for this classification, nor does it contain an explicit statement of purpose. Putting aside the question of the classification, we have no doubt that the purpose of the legislation is that which was stated in the Declaration of Policy found in the original version of the bill. That Declaration noted that, "[u]nresolved disputes between public employers and first-level supervisors are injurious to the public" and that the meet and discuss rights of first-level supervisors under PERA "do not provide a meaningful or enforceable method of resolving disputes." H.R. 2183, November 20, 2001, Printer's No. 2934, 186th Gen. Assem., Reg. Sess., Sections 101 (Pa.2002).
Legislation calling for collective bargaining obviously involves and addresses a legitimate state interest. But, the question here is whether requiring collective bargaining with first-level supervisors with respect to only one of countless public employers is rationally related to that state interest.[16] We agree with the Commonwealth *1096 Court that there is no rational reason to treat first-level supervisors of the Commission differently than all other first-level supervisors of other public employers when it comes to collective bargaining. There is nothing distinctive about the Commission and its relationship with its first-level supervisors that separates it from all other Commonwealth public employers, thus requiring different treatment.
We are unpersuaded by Local 30's argument that the Commission is unique because unresolved labor disputes involving first-level supervisors could negatively affect the health, safety and welfare of the public traveling on the turnpike. As the Commonwealth Court noted, "it is difficult to see how an unresolved labor dispute would harm the public or hinder its ability to use the Turnpike." Pa. Turnpike Comm'n, 855 A.2d at 927 n. 8. The first-level supervisors supervise the Commission employees who actually perform the work, such as road maintenance, which is necessary to protect the public. Local 30 fails to identify any specific consequence of an unresolved labor dispute between the Commission and its first-level supervisors which would compromise public safety. In this regard, it is important to note that the Commission's first-level supervisors did not have the right to strike under PERA, nor do they possess such a right under the Act. Consequently, it is not at all apparent that an unresolved labor dispute between the Commission and its first-level supervisors would have a significant impact on the health, safety and welfare of those who travel the turnpike, thus requiring legislative intervention via the targeted legislation represented by the Act.
Moreover, the Commission is not the only entity charged with maintenance and up-keep of the Commonwealth roadways. There are other roadways in Pennsylvania besides the turnpike and there are other entities throughout the Commonwealth, including the Pennsylvania Department of Transportation, that have or could have first-level supervisors, who maintain those roadways. These other entities are also, to some degree, responsible for the health, safety and welfare of the individuals traveling on Commonwealth roadways, and there is no reason, under Local 30's theory, why collective bargaining rights should not have been extended to the first-level supervisors of those public employers as well. In short, even if the analysis were as confined as Local 30 would have it, the Act's classification does not rest upon some ground of difference or any real distinction between the Commission's first-level supervisors and other Commonwealth-employed first-level supervisors.
We are also unpersuaded by the argument that singling out the Commission in this Act is constitutional because it is part of an incremental approach or pilot program. This Court has addressed incremental approaches by the General Assembly to resolve Commonwealth-wide challenges. We have explained that "there is nothing improper about this method of attacking social problems of statewide dimension, as the Legislature is free for reasons of necessity or otherwise, to address such issues incrementally." Zogby, 828 A.2d at 1090-91. However, this Court has not held that such incremental approaches may be approved via special legislation. Indeed, this Court made clear that there is no pilot program exception to Article III, Section 32; the "relevant inquiry . . . is not whether such an exception exists, but whether the particular pilot program [] at issue constitutes special legislation." Id. at 1091 n. 16. Thus, whether or not the Act sub judice was a part of an incremental *1097 approach begs the constitutional question, which is whether the legislation passes muster under Article III, Section 32. The General Assembly indeed may take an incremental approach to rectify problems that are of legitimate Commonwealth-wide concern, but it may not employ an incremental approach that constitutes special legislation.[17]
While recognizing the fact that there may be a legitimate state interest undergirding the Act, we are constrained to conclude that the Act here constitutes special legislation in violation of Article III, Section 32 because the narrow classification in the Act, as written, does not bear a reasonable relationship to that purpose. This Court can discern no significant distinctions between the Commission's first-level supervisors and other publicly employed first-level supervisors to justify such special differential treatment.
Although this is enough to decide the case, we must offer some comment on the Commission's argument concerning per se unconstitutionality, given Local 30's characterization of our teaching in this area as dicta. By way of background, the first challenge under Article III, Section 32 came before this Court in 1875. See Wheeler v. City of Phila., 77 Pa. 338 (Pa. 1875) (upheld Act of May 23, 1874, which divided Pennsylvania cities into three classes for purpose of legislation regarding municipal governmental matters, as constitutionally proper general classification). In answering the suggestion that the legislation was a special law in violation of Article III, Section 32 because Philadelphia was the only city at that time to qualify as a first class city, the Court found the argument unsound because other cities' populations could rise above 300,000 and become members of the first class. Id. at 10. This Court later explained the Wheeler holding in Haverford Township as follows: "the fact that Philadelphia was the only member of a class did not make the act local, since it provided for a class as such, into which other members might come." Haverford Township, 28 A.2d at 789. In Harristown Development Corp., after finding that there was a rational basis for the classification at issue, the Court rejected the appellee's argument that the legislation was violative of Article III, Section 32 as special legislation in that it created a class with only one member. The Court explained that in Haverford Township, we held that a "classification of one member is not unconstitutional so long as other members might come into that class" before noting that the class in Harristown Development Corp. was not closed, and was therefore constitutional. Harristown Development Corp., 614 A.2d at 1132 n. 9.
Given this background, it is not surprising that an argument would arise that, if a class of one were indeed closed, the legislation could not pass muster. In Hickok I, this Court expressly recognized the prospect *1098 of such a finding of per se unconstitutionality. After finding that the legislation at issue was not rationally related to a legitimate state purpose, the Hickok I Court announced an alternative holding that a "classification is per se unconstitutional when the class consists of one member and it is impossible or highly unlikely that another can join the class." Hickok I, 761 A.2d at 1136. Most recently, in Zogby, this Court, citing to Harristown Development Corp., again adverted to the distinction that undergirds the per se theory where we explained that even though the city of Harrisburg was the only current member of the legislative classification at issue, the legislation did not create a closed class because it was possible for other members to join the class. Zogby, 828 A.2d at 1091.
In light of this authority, Local 30's argument that the per se unconstitutional standard is dicta fails. The per se unconstitutionality standard is solidly rooted in our case law and was clearly set forth as a specific, albeit alternate, holding in Hickok I. "Where a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of obiter dictum[.]" Commonwealth ex rel., Fox v. Swing, 409 Pa. 241, 186 A.2d 24, 26 (1962). Thus, it is clear a statute may be deemed per se unconstitutional if, under the classification, the class consists of one member and is closed or substantially closed to future membership. In this case, our analysis above makes it clear that the General Assembly created a class with one member and did so in a fashion that makes it impossible for another member to join the class. The class will never open to more than one member because the General Assembly defined "public employer" as "The Pennsylvania Turnpike Commission." Local 30's argument that the class is open because another Commission could be created in the future is illogical because if another Commission was created, the current Commission would no longer exist. Moreover, the Act would not apply to the new Commission because it would not be "the" Commission referenced in the Act. As this Court explained in Hickok I, in response to the argument that it was possible that the capital of Pennsylvania might be moved in the future:
This argument is without merit, for the statute authorizing the location of the capital specifies that there be only one capital city, Act of Feb. 21, 1810, PL 30 § 1. There can, therefore, be no more than one member of the class. The Commonwealth Court was correct, therefore, in determining that the Reed Amendment is constitutionally infirm.
Hickok I, 761 A.2d at 1136. This legislation is unconstitutional per se.[18]
For the foregoing reasons, we find that the Commonwealth Court correctly held that the Act was unconstitutional as a special law in violation of Article III, Section 32. Accordingly, we affirm the judgment below.
Chief Justice CAPPY, and Justice NEWMAN, Justice SAYLOR, Justice EAKIN, Justice BAER and Justice BALDWIN join the opinion.
NOTES
[1] PERA defines both "public employee" and "public employer" at Section 1101.301. PERA provides for collective bargaining as follows:

It shall be lawful for public employes to organize, form, join or assist in employe organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice and such employes shall also have the right to refrain from any or all such activities, except as may be required pursuant to a maintenance of membership provision in a collective bargaining agreement.
43 P.S. § 1101.401.
[2] PERA defines "First level of supervision" and "first level supervisor" to "mean[] the lowest level at which an employe functions as a supervisor." 43 P.S. § 1101.301(19). A "supervisor" is defined as:

any individual having authority in the interests of the employer to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employes or responsibly to direct them or adjust their grievances; or to a substantial degree effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment.
43 P.S. § 1101.301(6).
[3] PERA defines "public employer" as follows:

"Public employer" means the Commonwealth of Pennsylvania, its political subdivisions including school districts and any officer, board, commission, agency, authority, or other instrumentality thereof and any nonprofit organization or institution and any charitable, religious, scientific, literary, recreational, health, educational or welfare institution receiving grants or appropriations from local, State or Federal governments but shall not include employers covered or presently subject to coverage under the act of June 1, 1937 (P.L. 1168), as amended, known as the "Pennsylvania Labor Relations Act," the act of July 5, 1935, Public Law 198, 74th Congress, as amended, known as the "National Labor Relations Act."
43 P.S. § 1101.301(1) (footnotes omitted).
[4] PERA's declaration of policy reads as follows:

The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution. Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public employers to negotiate and bargain with employe organizations representing public employes and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large.
43 P.S. § 1101.101.
[5] Of the 2,400 Commission employees, approximately fifty are first-level supervisors. Pa. Turnpike Comm'n v. Commonwealth, et al., 855 A.2d 923, 925 (Pa.Cmwlth.2004).
[6] Section 1103.302 of the Act provides that: "Collective bargaining shall begin at least six months before the start of the fiscal year of the public employer, and any request for arbitration as provided in this act shall be made at least 110 days before the start of the fiscal year." 43 P.S. § 1103.302.
[7] In relevant part, Article III, Section 32 of the Pennsylvania Constitution provides:

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
* * *
7. Regulating labor, trade, mining or manufacturing.
PA. CONST. Art. III, § 32(7).
[8] While the Pennsylvania Labor Relations Board filed a notice of non-participation, both Local 30 and the Attorney General filed briefs in opposition to the Commission's motion for summary judgment.
[9] Local 30 notes that, since 1974, this Court has articulated and employed a rational basis test for issues arising under Article III, Section 32, in the process mirroring the approach to equal protection claims employed by the United States Supreme Court.
[10] The Commission deems it notable that neither the Pennsylvania Office of Attorney General, which is responsible for defending the constitutionality of the Act, nor the Pennsylvania Labor Relations Board, which is charged with enforcing the Act, have questioned or challenged the Commonwealth Court's decision in this Court.
[11] The Second-Class County Port Authority Act ("Port Authority Act"), 55 P.S. § 551 et seq.
[12] The School Administrators Act, 71 P.S. § 371.
[13] For a fuller explanation of the reason for the adoption of the special legislation proscription, as well as the subsequent interpretive experience under the provision, see Zogby, 828 A.2d at 1088-90.
[14] The Commission challenged the Act below under Article III Section 32 and did not assert a violation of equal protection under the U.S. Constitution. In any event, this Court would apply the same analysis and reach the same result under either charter. Zogby, 828 A.2d at 1088; DeFazio, 756 A.2d at 1105; Curtis, 666 A.2d at 267; Harristown Dev. Corp., 614 A.2d at 1132.
[15] See Zogby, 828 A.2d at 1088-89 (differential treatment of persons with different needs appropriate "provided the classifications at issue bear a reasonable relationship to a legitimate state purpose."); Ligonier Tavern, Inc. v. Workers' Compensation Appeal Bd. (Walker), 552 Pa. 237, 714 A.2d 1008, 1011 (1998) ("Neither the equal protection guarantee of the federal constitution nor the corresponding protection in our state constitution forbids the drawing of distinctions, so long as the distinctions have a rational basis and relate to a legitimate state purpose."); Wilkinsburg Police Officers Ass'n (Harder) v. Commonwealth, 535 Pa. 425, 636 A.2d 134, 140 (1993) (statutory classification must have rational relationship to proper state purpose); Commonwealth v. Hicks, 502 Pa. 344, 466 A.2d 613, 615 (1983) ("[T]he prohibition against special legislation contained in article III, section 32 of the Pennsylvania Constitution also requires that legislative classifications have some rational relation to a proper state purpose."); Tosto v. Pa. Nursing Home Loan Agency, 460 Pa. 1, 331 A.2d 198, 204 (1975) ("[T]he prohibition of special laws ... requires only that a classification must have some rational relationship to a proper state purpose.").
[16] For reasons stated infra, where we discuss whether the statute is per se unconstitutional, we reject Local 30's argument that the class should be deemed open to more than one public employer because additional turnpike commissions could be created some day.
[17] Local 30's citation to the Port Authority Act and the School Administrators Act as proof that the General Assembly has previously extended the same collective bargaining rights to first-level supervisors of other public employers in the Commonwealth, and that this Court has sanctioned the General Assembly's power to do so, is unpersuasive. First, as the Commission notes, the Port Authority Act applied to Port Authorities in second-class counties and the School Administrator Act applied to school administrators in first-class counties, which are settled, legitimate classifications. The Act at issue here, in contrast, applies solely to the Commission. Furthermore, in point of fact, neither the Port Authority Act nor the School Administrators Act was challenged as violative of Article III, Section 32, and neither was determined by this Court to be constitutional under Article III, Section 32. Thus, this Court has neither approved nor disapproved of those Acts as special legislation.
[18] Local 30's reliance on Zogby to support its argument that the General Assembly may implement limited, remedial measures as part of a long-term strategy to fulfill a duty connected to the public interest, Zogby, 828 A.2d at 1088, is misplaced. In Zogby, we specifically noted that the General Assembly cured the defect identified in Hickok I by expanding the class affected by the subject legislation, and thus, opened the previously closed class. Zogby, 828 A.2d at 1089, 1091. The closed class here was not opened by further legislation and remains closed.