Kevin **HOGRELIUS**, Appellant,

v.

Hilary **MARTIN**, Appellee.

Superior Court of Pennsylvania.

Submitted Feb. 11, 2008.

Filed May 29, 2008.

Mark R. Ashton, Exton, for appellant.

Marta S. Laynas, West Chester, for appellee.

BEFORE: ORIE MELVIN, BOWES and COLVILLE,* JJ.

OPINION BY BOWES, J.:

¶ 1 Kevin Hogrelius ("Father") appeals from the order entered on August 17, 2007, permitting Hilary Martin ("Mother") to relocate with the parties' daughter, Alisia Marie Hogrelius, from Chester County to McLean, Virginia. We affirm.

¶ 2 The trial court summarized the relevant facts as follows:

Mother and Father met in high school, and began dating in the year 2000. In January of 2002 Mother became pregnant, and on October 21, 2002, Alisia Marie Hogrelius was born. Once Alisia was born, Mother and Father began living together at Ms. Martin's mother's house in Phoenixville, Pennsylvania.

The couple continued living together for approximately two years, during which time both Mother and Father attended school and worked. While living together the couple discussed marriage and attended Pre–Cana classes with their priest. In November of 2002, Father told Mother that he did not want to get married, at which time Mother asked him to move out. The couple continued to date until January of 2005.

Following the breakup, Mother continued to go to school until December 2006. In August 2005, Mother began to work as a food runner and waitress at Flanagan's Boat House in Malvern, Pennsylvania. She then started a second job as a dental assistant to better support herself and Alisia. Mother also cares for her own ill mother ("Grandmother"), whom she and Alisia live with. Eventually, the stress of working two jobs, school, and helping to care and support both Alisia and her ill mother, forced Ms. Martin to drop out of school in December of 2006. She eventually quit her job at the Boathouse because of a decrease in wages and currently continues to work as a dental assistant. According to Mother's 2006 income tax return, Mother made $24,344.00 working two jobs. Mother has little opportunity for advancement in her current position as a dental assistant. Mother pays $74.00 a week for daycare, $130.00 a month for telephone and internet, $570.00 a month for student loans, $100.00 to $150.00 a week for groceries, and for half of the utilities.

After Mother and Father separated, Father continued to go to school and work part-time. Father contributes $80.00 a month to help support Alisia in accordance with a Child Support Order entered August 9, 2005. He is currently working as an intern at Cephalon as a clinical data coordinator. He is paid $12.00 an hour and works a forty hour week. That averages out to approximately $25,000.00 gross annual income. According to Mother, Father is current

* Retired Senior Judge assigned to the Superior Court.

on his obligation. He testified that the only time he has ever given Mother extra money towards Alisia's support was one time, when he contributed $75.00 to Alisia's day care. She has been in daycare for approximately two years.

Father has been attending school since 1997. Seven years later, in 2004, he received his Associate's degree from Delaware County Community College. He currently attends Eastern University, and is majoring in biology, with a minor in information technology. He is currently 6 credits short of finishing his degree there, which he estimates he will do in the spring of 2008.

After moving out, Father continued to see his daughter on a weekly basis. In May of 2005, Father filed for joint legal and shared physical custody of the child, because Mother did not allow him to bring Alisia to a family event. Father explained that this was the only time she withheld Alisia from him. An Order was entered on May 11, 2005, as a result of a mutual custody agreement by Mother and Father, granting joint legal and shared physical custody. Mother has primary custody. The agreement outlines a schedule by which Father spends time with Alisia Monday, Wednesday, and Fridays from 3:00 pm until 8:30 pm, and also, every other weekend. Mother has Alisia all other times. It appears that Mother and Father have been flexible to accommodate their individual schedules, and have made changes as needed without need to involve the court. The Custody Order also provided a schedule for holidays.

Father appears to have a healthy relationship with his daughter. He plays games with her, and picks her up from day care on Mondays, Wednesdays, and Fridays. Father testified that he opposes the move because he does not think it is in her best interest to move away from him and his family.

Trial Court Opinion, 10/24/07, at 3–5 (footnotes omitted).

¶ 3 On June 18, 2007, Mother filed a petition for special relief seeking to relocate to McLean, Virginia, to reside with her then fiancé, now husband, Susuma "Gene" Itoh, and his five-year-old son from a previous marriage. Mr. Itoh is a resident of Virginia, and he is employed with MedSource Consultants ("MedSource") in Chantilly, Virginia. Mother first met Mr. Itoh in October 2005 through an Internet dating service for single parents. The couple dated for approximately one year, saw each other on weekends, and on January 4, 2007, announced their engagement to be married. Mother married Mr. Itoh on July 7, 2007, and the first child of the marriage presumably was born in December 2007. Upon relocation to Virginia, Mother intended to remain at home with the children and her own ailing mother ("Grandmother")[1] while Mr. Itoh continues his employment with MedSource.

¶ 4 Following Father's response to Mother's petition for relocation on July 9, 2007, the trial court held evidentiary hearings on August 15 and 16, 2007, and on August 17, 2007, the trial court granted Mother permission to relocate. This timely appeal followed on September 14, 2007. Pursuant to the court's direction, Father filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) on September 24, 2007.

¶ 5 Father presents the following issues for our review:

1. Whether the [t]rial [c]ourt erred in determining Mother's proposed reloca-

---

1. Grandmother suffers from multiple sclerosis and osteoporosis. N.T., 8/15/07, at 36.

tion would substantially improve her life and the life of the parties' child where the only benefit is that Mother will reside with the man she married just one month ago?

2. Whether the [t]rial [c]ourt erred in determining Mother's proposed custody arrangement that reduces Father's custodial time by approximately fifty percent (50%) and separates him from his child by 149 miles and/or a 5½ hour one way commute is a realistic substitute schedule?

Father's brief at 4.

¶ 6 Initially, we note our scope and standard of review:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.

*Johns v. Cioci*, 865 A.2d 931, 936 (Pa.Super.2004) (citations and quotation omitted).

¶ 7 With any child custody case, the paramount concern is the best interests of the child. *Landis v. Landis*, 869 A.2d 1003, 1011 (Pa.Super.2005). This standard requires a case-by-case assessment of all of the factors that may legitimately affect the "physical, intellectual, moral and spiritual well-being" of the child. *Id.* (citations omitted). As we previously explained, "[t]here is no black letter formula that easily resolves relocation disputes; rather,

custody disputes are delicate issues that must be handled on a case by case basis." *Baldwin v. Baldwin*, 710 A.2d 610, 614 (Pa.Super.1998).

¶ 8 Father's appeal challenges the trial court's determination pursuant to *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990), that Mother demonstrated relocation was in Alisia's best interest. First, Father asserts that relocation would not substantially improve Alisia's quality of life. Next, Father argues that Mother's proposed alternative custody arrangements are inadequate. For the following reasons, we disagree with both contentions.

¶ 9 As this Court recently reiterated, "[W]hen a custody case includes a request by one of the parents to relocate with the child, then the best interest analysis must incorporate the three factors originally summarized in *Gruber* [.]" *Klos v. Klos*, 934 A.2d 724, 728 (Pa.Super.2007). Those factors consider:

(1) the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

(2) the integrity of the motives of both the custodial and noncustodial parent in either seeking the move or seeking to prevent it; [and]

(3) the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Id.* (quoting *Collins v. Collins*, 897 A.2d 466, 471 (Pa.Super.2006)).

¶ 10 In considering the potential advantages of the proposed move, the trial court

herein concluded that relocation would provide an economic benefit to Alisia because Mr. Itoh earns approximately $100,000 per year in his position with Med-Source. Specifically, the trial court noted that Mr. Itoh's earnings surpass the present total of Mother's and Father's earnings combined. Trial Court Opinion, 10/24/07, at 9–10. The court also observed that due to Father's limited income, he provides Alisia with only $80 per month in child support. *Id.* at 10. In contrast, the court found that Mr. Itoh's income would permit Alisia to participate in activities, which due to Mother's and Father's limited income would not be available to Alisia in Pennsylvania. *Id.*

¶ 11 Father asserts that the trial court abused its discretion in finding that relocation to McLean, Virginia, would benefit Alisia economically. Essentially, Father argues that the trial court overstated Mr. Itoh's annual earnings as more than $100,000 because only $50,000 of that sum is guaranteed salary; the remaining earnings are contingent upon bonuses and commissions. Father's brief at 13. Father also contends that the significance of Father's earnings is reduced by the high cost of living in an affluent suburb of Washington, D.C. In addition, Father argues that the court understated Father's earning potential upon obtaining his degree from Eastern University.

¶ 12 The record supports the trial court's findings. During the August 2007 custody hearings, Mr. Itoh testified that his W–2 forms reflected earned wages of $108,924 in 2005 and $111,305 in 2006 from his position as a Senior Consultant with MedSource. N.T. Custody, 8/16/07, at 159. While his base salary is $50,000, there is no limit to the amount that he can earn through bonuses and commissions. *Id.* at 160. Mr. Itoh characterized his area of employment as a specialized, niche field

that recruits physicians for temporary or permanent placement in medical facilities. N.T. Custody, 8/15/07, at 146. Mr. Itoh presently supervises MedSource's Locum-tenens division, which provides temporary placement for psychiatrists. *Id.* at 147. Additionally, Mr. Itoh anticipates that he also will be called upon to supervise Med-Source's newly-formed division catering to family practice physicians. N.T., 8/16/07, at 154. Mr. Itoh explained that his success with MedSource is founded upon relationships he cultivated with local physicians and facilities over the past two to four years. *Id.* at 153. Hence, even if a comparable employer existed in the greater Philadelphia area, which Mr. Itoh testified did not, his level of success would diminish significantly until he was able to develop contacts in that region. N.T., 8/15/07, at 146. In addition, Mr. Itoh testified that he has obligations to his family's restaurant, Makoto, located in Washington, D.C. *Id.* at 138. Mr. Itoh is the vice president and secretary of the restaurant's corporate owner, Silver Rooster Corporation. *Id.* at 141; Plaintiff's Exhibit 11. Mr. Itoh believes that he will assume control of the financially successful restaurant upon his father's retirement. *Id.* at 143.

¶ 13 Thus, despite Father's assertions to the contrary, the record confirms that Mr. Itoh is financially stable. Although his base salary is $50,000, he has earned twice that amount for the past two years. The anticipated opportunity to supervise a second division within MedSource suggests his earnings may actually increase in the future. Accordingly, we find the trial court did not commit an abuse of discretion by emphasizing the benefit Mr. Itoh's income will provide Alisia upon her relocation to McLean.

¶ 14 Furthermore, Father's related assertion that Mr. Itoh would have difficulty supporting a household of three adults and

three children is unavailing. The crux of this argument is that in light of Mr. Itoh's responsibilities to his son from a prior relationship, his child with Mother who presumably was born in December 2007, Mother, and Grandmother, and the high cost of living attributed to suburban Washington, D.C., the significance of Mr. Itoh's $100,000 annual income is minimal as it relates to any improvement to Alisia's quality of life. In an attempt to bolster this position, Father argues that Mother did not provide the court with a budget detailing how Mother and Mr. Itoh intended to pay their household expenses. We reject this claim.

¶ 15 First, as Mother accurately observes, the record belies Father's contention that Grandmother will be a financial liability upon the new family. Indeed, during the custody hearing, Mother explained that Grandmother, who intends to sell her present home in anticipation of the move to Virginia, provides her own support through an annuity established by Grandmother's parents. *Id.* at 45. More importantly, nothing in the record supports Father's suggestion that Mr. Itoh's wages are insufficient to both support the family's needs and provide Alisia with the opportunities to participate in activities, such as dance lessons, that are presently beyond the combined means of Mother and Father. Furthermore, if Mother and Mr. Itoh desire to supplement the family's income, Mother may elect to seek part-time employment. *Id.* at 72. Hence, we do not believe the trial court overstated the financial benefit to Alisia in permitting her to relocate with Mother to McLean, Virginia.

¶ 16 Next, we address Father's complaint that the trial court understated his income in determining the significance of Mr. Itoh's income relating to the first *Gruber* factor. Father argues the trial court should have considered his **potential** income of $40,000 per year upon his anticipated graduation from Eastern University in the spring of 2008 rather than the $25,000 per year he earned at the time of trial. Father also asserts that the trial court did not impute earnings to Mother based upon what she potentially could have earned if she was employed as a full-time dental assistant. Again, we find Father's contentions to be lacking in merit.

¶ 17 The record supports the trial court's determination. Father testified that he presently earned $12 per hour working forty hours per week as a summer intern at Cephalon, Inc. ("Cephalon"). N.T., 8/16/07, at 232–33. While Father conceivably would earn approximately $25,000 per year as an hourly employee, the position he held as of the date of the custody hearings merely was a paid internship. *Id.* at 233. Father will earn less in the fall working part-time. *Id.* However, upon his expected graduation in the spring of 2008, he intends to apply for a full-time position with Cephalon as a clinical research associate or a clinical data coordinator. *Id.* at 234. Assuming both that Father graduates on schedule and that Cephalon employs him, Father testified that he could earn $40,000 per year, with the possibility of earning $80,000 per year. *Id.* at 234–35.

¶ 18 There was no abuse of discretion. In fact, we believe the trial court generously attributed the $25,000 yearly income to Father even though Father only earned a portion of that amount. Furthermore, the record does not disclose that Father actually has obtained employment with Cephalon when he returns to school in the fall or upon his graduation from Eastern University. Indeed, referencing his employment plans following the summer internship, Father testified, "I applied for a job in a different department, clinical documentation. It will be a part-time job."

*Id.* at 233. Likewise, Father framed his career plans following graduation as, "Assuming I graduate, I am hopefully going to be, I will apply to Cephalon full-time either as a contract worker or as a full-time employee." *Id.* at 234. In light of the speculative nature of Father's short and long-term earning capacity, Father's challenge to the trial court's decision to assess a yearly earning potential of $25,000 is tenuous. It is not unrealistic, for one of a myriad of reasons, to conclude that Father may fail even to attain that salary.

¶ 19 Father's related assertion concerning the trial court's calculation of Mother's income also is unavailing. We observe that the record supports the court's decision to calculate Mother's income based upon her 2006 tax return rather than her future earning potential if she were employed full-time as a dental assistant. Father is preoccupied with earning potential. We remind him that this is not a child support case; rather, it is a custody dispute that requires a review of the parties' current incomes to help determine if relocation is in Alisia's best interest. *See Gruber, supra.* Having said that, we find that the trial court did not commit an abuse of discretion by employing the income confirmed by Mother's 2006 tax return in illustrating that Mr. Itoh's yearly income is double the combined income of Mother and Father. The trial court's point is well taken: relocation would provide Alisia with an economic benefit.

¶ 20 Father also criticizes the trial court's analysis of the first *Gruber* factor as it relates to non-economic benefits. This argument is founded upon the propositions that relocation (1) would not provide substantial non-economic benefits to Alisia and (2) would produce a precarious living arrangement. Father's brief at 16. Essentially, Father challenges the trial court's findings that relocation would per-mit Alisia to reside in a larger house in an affluent community with good schools and permit Mother to remain home with Alisia and her half-sibling while Mr. Itoh supports the family. Instead, Father characterizes the planned living arrangement as "a highly unstable environment" presumably because Mother and Mr. Itoh courted over the Internet and intend to reside together in a home owned by Mr. Itoh's Father. N.T., 8/15/07, at 181.

¶ 21 Our examination of the record discloses that Father's characterizations are unfounded. First, Father conceded that McLean, Virginia, is a suitable area for Alisia to reside and that the local school system, Fairfax County, would provide a suitable education. *Id.* at 181–82. Notably, the trial court stated, "I can almost take judicial notice of [the area's affluence]." *Id.* at 181. Similarly, Mr. Itoh observed that his prior research revealed that Fairfax County School System employed small class sizes, which produces a higher teacher-to-student ratio. *Id.* at 184. Likewise, Mr. Itoh testified that he recently reviewed a *Forbes Magazine* article ranking Fairfax County as among the leaders in spending per student. *Id.* at 184–85. Furthermore, as Mother accurately observes, Father is clearly disenchanted with the Phoenixville schools that Alisia would attend if relocation was denied, preferring instead that she attend a Lionville area school. N.T., 8/18/07, at 307. Thus, to the extent that Father disputes the trial court's findings that Alisia would benefit from relocating to an affluent area and attending a school with access to substantial resources, his challenge fails. The record supports the trial court's determinations in this regard.

¶ 22 The record also sustains the trial court's determination that Alisia would benefit from residing in the $800,000 home Mr. Itoh intends to purchase from his

Father for below-market value. *Id.* at 217. While Mr. Itoh's father and stepmother will remain in that residence temporarily, they plan to move, in late 2007, to another property the family owns. *Id.* at 175–76. The home in which Alisia and Mother will reside with Mr. Itoh, his son, and their baby, is a single-family, four-bedroom home with three full baths. N.T., 8/15/07, at 68–69. The home has a large kitchen, dining room, living room, family room, two sitting rooms, and laundry room. *Id.* There is a large yard that is sufficient for a child's swing set. *Id.* By comparison, the three-bedroom, two-and-one-half bath townhouse in which Mother, Grandmother, and Alisia live in Phoenixville is much smaller, and it sits on a small yard that does not accommodate Alisia's activities. *Id.* at 50–51. Accordingly, the record supports the trial court's finding in this regard also.

¶ 23 Father's final contention concerning the first *Gruber* factor is that Mother's relationship with Mr. Itoh is unstable. The record belies this assertion. Mother dated Mr. Itoh for fifteen months prior to their engagement, and they did not wed for another six months. As Mother testified during the custody hearing, the relationship between her and Mr. Itoh grew out of their telephone conversations and weekend visits. *Id.* at 61. Mother explained that she did not include Alisia in her early visits with Mr. Itoh as a precaution against confusing the child. *Id.* Later in the relationship, Alisia accompanied Mother on a visit to McLean, Virginia. *Id.* Contrary to Father's assertions, the record does not demonstrate the relationship is unstable. Instead, in light of the distance involved, the parties' work schedules, household responsibilities, and the length of the courtship, we find that the relationship displays the flexibility that forms the underpinning of a stable relationship.

Hence, we reject Father's suggestion that Mother's marriage to Mr. Itoh is unstable.

¶ 24 As Father does not challenge Mother's motives for seeking to relocate to Virginia, we next address Father's argument relating to the court's application of the third *Gruber* factor. Essentially, Father asserts the trial court did not consider the impediments that the increased distance between Father and Alisia would have upon Father's involvement in her life. Father argues that the proposed custody schedule would nearly cut his period of custody in half and that his relationship with Alisia would be severely compromised as a result.

¶ 25 In addressing this prong of the *Gruber* analysis, a court's determination is not whether the alternative schedule would maintain the current level of the non-custodial parent's interaction with the children, but rather whether the substitute arrangements "will foster adequately an ongoing relationship" between the non-custodial parent and the children. *White v. White,* 437 Pa.Super. 446, 650 A.2d 110, 113 (1994). This Court addressed a similar contention in *Goldfarb v. Goldfarb,* 861 A.2d 340, 346 (Pa.Super.2004), and concluded that the distance between the non-custodial parent and his relocated children is not the controlling concern. We stated, "If it were, no necessity for a *Gruber* analysis would ever have arisen, as physical proximity would be a *sine qua non* of most if not all custody determinations." *Id.* Thus, although an alternative custody schedule necessarily reduces the frequency of a parent's interaction with a child because of the distance involved, relocation should not be denied for that reason alone. *Gruber,* 583 A.2d at 439–40. *See also Ketterer v. Seifert,* 902 A.2d 533, 539 (Pa.Super.2006) (fact that move of considerable distance will increase cost and logistical problems of maintaining contact between

non-custodial parent and child will not necessarily preclude relocation when other factors favor it).

¶ 26 Herein, Mother's proposed custody schedule offered Father physical custody of Alisia during alternating weekends, most holidays, and seven weeks during the summer. N.T., 8/15/07, at 87–90. The parties would alternate Christmas Eve and Easter holidays, and once Alisia starts school, Father would exercise custody during extended breaks from school. *Id.* at 91. Mother also proposed to assist Father, if necessary, by driving Alisia to Father's house on Fridays and meeting Father midway on Sunday to retrieve her. *Id.* at 86–87.

¶ 27 In accepting Mother's proposed schedule, the trial court reasoned, *inter alia*, that since the proposed schedule increases Father's extended, overnight custody, it would adequately foster a healthy relationship between Father and daughter. We agree.

¶ 28 In *Billhime v. Billhime*, 869 A.2d 1031, 1039 (Pa.Super.2005), a panel of this Court recently relied upon our prior reasoning in *Goldfarb* to reverse a trial court's order denying the appellant-mother's relocation request, stating, "A move that will substantially improve the quality of life for Mother and the children cannot be defeated solely to maintain Father's existing visitation schedule." The facts of the case at bar align with the facts underlying *Billhime* and *Goldfarb*. Here, as in those cases, the remaining *Gruber* factors militate in favor of relocation. As we have pointed out, the trial court found that the proposed relocation would substantially improve Alisia's quality of life, and our review of the record supports that conclusion. Additionally, Father does not challenge Mother's motivation for seeking to relocate to McLean. Therefore, we find

no reason to disturb the trial court's determination.

¶ 29 Having found that the evidence of record confirms the trial court's analysis of the *Gruber* factors and that the court otherwise considered the best interests of the child, we affirm the trial court's order permitting Mother to relocate to Virginia with Alisia Marie Hogrelius.

¶ 30 Order affirmed.