**Stuart J. MACKAY, Appellee**

v.

**Jamie K. MACKAY, Appellant.**

**Jamie K. Mackay, Appellant**

v.

**Stuart J. Mackay, Appellee.**

Superior Court of Pennsylvania.

Argued Aug. 25, 2009.

Filed Nov. 13, 2009.

Joanne R. Wilder, Pittsburgh, for appellant.

Brian C. Vertz, Pittsburgh, for appellee.

BEFORE: BENDER, BOWES and CLELAND, JJ.

OPINION BY BENDER, J.:

¶ 1 In these consolidated appeals, Jamie K. Mackay ("Mother") appeals from the orders entered on January 22, 2009 and January 26, 2009, respectively, wherein the trial court directed Stuart J. Mackay ("Father") to pay a monthly child support obligation of $810.00 for three minor children and denied Mother's "Petition to Enforce Agreement" and her claim for counsel fees.[1] We affirm.

¶ 2 The trial court succinctly summarized the underlying facts and procedural history as follows:

Mother and Father married in 1988. Four children were born during the marriage. Father was employed selling water treatment systems until August of 1992, when he and Mother decided he would leave his employment to serve as the stay-at-home caregiver for the parties' children. Mother served as the "breadwinner" for the family through her employment as the Director of Environmental Health and Safety for a large multinational corporation. The parties separated in April of 2005, with Father relocating to Florida with his parents. The litigation that initiated these proceedings was a Complaint for Spousal Support filed by Father in May of 2005.

Father filed a Complaint in Divorce in July of 2005, and the undersigned presided over the trial of the claims for equitable distribution, alimony *pendente lite*, alimony, child support and counsel fees held from May 31 to June 1, 2006. [The trial court] distributed the marital estate 50% to each party, awarded Father alimony *pendente lite* but denied his alimony claim, denied Father's counsel fee claim and awarded Mother child support of $698 per month. [The trial court] entered a divorce decree in December of 2006. In March of 2007 the parties modified the child support by consent order to $1,094 per month.

In May of 2008 Mother filed a Petition to Enforce Agreement to Pay College Expenses and Father filed a Petition to Modify Child Support. By consent of the parties, [the trial court] consolidated the Petitions for a hearing held on January 13, 2009. In two separate orders, [the trial court] awarded Mother support of $810 per month for the three minor children in her custody but denied her request to force Father to contribute to the college expenses of the parties' oldest child. Mother filed timely appeals from these orders.

Trial Court Opinion ("T.C.O."), 4/13/09, at 1–2 (footnote committed).

¶ 3 Mother filed her notices of appeal on February 6, 2009, and on February 25, 2005, Mother complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Mother presents six questions for our review:

I. Whether the trial court erred in failing to grant Mother's Petition to Enforce Agreement and by failing to enforce the parties' agreement to share the

---

1. Although the January 26, 2009 order also denied Father's request for alimony and his

claim for counsel fees, Father did not appeal that order.

costs and expenses of their children's college educations.

II. Whether the trial court erred in failing to require Father to reimburse Mother for his fair share of the costs and expenses incurred and paid to-date by Mother for the college education of the parties' daughter, and by failing to require Father to pay his fair share of all future costs and expenses for the college educations of the parties' children.

III. Whether the trial court erred in calculating Mother's net monthly income.

IV. Whether the trial court erred in failing to calculate Father's net monthly income based upon his previously adjudicated and established earning capacity.

V. Whether the trial court erred in calculating guideline support and by failing to include and allocate support for all additional expenses for the parties children.

VI. Whether the trial court erred in failing to award Mother counsel fees for Father's failure to comply with the parties' agreement.

Mother's brief at 9.

¶ 4 When reviewing a support order, our standard of review is well settled:

[T]his Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.

*Samii v. Samii,* 847 A.2d 691, 694 (Pa.Super.2004) (citations omitted). Furthermore, this Court:

must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand.

*Hogrelius v. Martin,* 950 A.2d 345, 348 (Pa.Super.2008). "When the trial court sits as fact finder, the weight to be assigned the testimony of the witnesses is within its exclusive province, as are credibility determinations, [and] the court is free to choose to believe all, part, or none of the evidence presented." *Stokes v. Gary Barbera Enterprises, Inc.,* 783 A.2d 296, 297 (Pa.Super.2001), *appeal denied,* 568 Pa. 723, 797 A.2d 915 (2002). "[T]his Court is not free to usurp the trial court's duty as the finder of fact." *Isralsky v. Isralsky,* 824 A.2d 1178, 1190 (Pa.Super.2003) (quoting *Nemoto v. Nemoto,* 423 Pa.Super. 269, 620 A.2d 1216, 1219 (1993)).

¶ 5 This Court recently reiterated, "Pennsylvania law does not impose an obligation on parents to provide for their children's college expenses." *In re Estate of Johnson,* 970 A.2d 433, 439 (Pa.Super.2009) (citing *Blue v. Blue,* 532 Pa. 521, 616 A.2d 628 (1992), and *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265 (1995)). However, a parent may assume financial responsibility for a child's secondary education. *See Emrick v. Emrick,* 445 Pa. 428, 284 A.2d 682, 683 (1971); *Bender v. Bender,* 715 A.2d 1199, 1202 (Pa.Super.1998).

¶ 6 In *Johnson,* the father of two minor children executed a written marital dissolution agreement ("MDA"), wherein he

agreed, *inter alia*, to pay the children's college expenses according to a contemplated future agreement. The relevant provision provided, "Husband does agree to contribute to each child's college education pursuant to and in accordance with the agreement of the parties or applicable law." *Id.* at 439. However, after the father died, his estate challenged several facets of the agreement, including this obligation. The trial court held that the father's estate was not obligated to contribute to the children's college expenses because there was no enforceable agreement on that point in the marital settlement agreement. *Id.* at 435. This Court affirmed the trial court on this issue, holding that the mother and father failed to execute the future agreement contemplated in the MDA, and the provision did not contain sufficient specific terms to constitute an enforceable agreement in and of itself. Essentially, we concluded that the relevant provision was not tantamount to an enforceable agreement, but rather, it merely contemplated a future agreement.

¶ 7 Herein, Mother challenges the trial court's January 26, 2009 order denying her Petition to Enforce Agreement, wherein she alleged Father's oral agreement to pay for the children's college expenses.[2] In rejecting Mother's petition, the trial court reasoned as follows:

> [D]uring the marriage, possibly in October of 2004, [the parties] discussed their existing plan for Mother to retire in 2007 and care for the children while Father would return to the workforce. Father, who was handling the family's finances, said Mother and Father instead would both have to work to pay for their children's college educations.

[Father] does not dispute that the parties agreed at that time to pool their incomes to pay for their children's college educations. Mother asserts that this agreement, made during the parties' marriage, should still be enforced after the parties' separation and divorce. This position is untenable, as the verbal agreement clearly was premised on the parties continuing to live together as a single economic unit. For example, Mother acknowledged[,] "my salary went to paying the household expenses, so anything that he made would go to college expenses." [N.T. 1/13/09, at] 86.
T.C.O. at 3.

¶ 8 Mother argues that, although the trial court "found that the parties had an agreement, . . . the trial court erroneously declined to enforce the agreement because the parties were no longer together as husband and wife." Mother's brief at 17 (citations omitted). Mother continues that, since the parties' purported oral agreement was not contingent upon remaining married, the trial court erred in failing to enforce it. As noted, below, however, Mother's position misconstrues the trial court's findings.

¶ 9 Where, as here, a party seeks to enforce a disputed oral agreement, it is incumbent upon that party to establish the essential terms and conditions that constitute the enforceable agreement. *Boyle v. Steiman,* 429 Pa.Super. 1, 631 A.2d 1025, 1033 (1993). Further, unlike a disputed written agreement, "in cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to surrounding circumstances and course of dealing between the

---

**2.** While it is axiomatic that Pennsylvania courts recognize oral agreements as valid and enforceable contracts, neither party in this matter identified a case wherein a court enforced an oral agreement for one parent to pay for college expenses. Likewise, our independent review of Pennsylvania case law did not reveal such a case.

parties in order to ascertain their intent." *Id.*

¶ 10 In contrast to Mother's assertion that Father conceded an oral agreement to contribute to the children's college expenses, the trial court did not find an enforceable oral contract between the parties. Rather, the trial court observed that, (1) during the marriage, the parties pooled their income, and (2) during October 2004, while the marriage was still intact, Mother and Father agreed that they would have to continue to pool their income in order to pay for the children's college educations. *See* T.C.O. at 3. Thus, instead of permitting Mother to retire and reintroducing Father to the work force, the trial court found that Mother and Father agreed they both would have to work in order to pay for college. Accordingly, we reject Mother's contentions that the trial court identified a valid oral contract between the parties but excused Father from performing his obligation because the parties no longer were married. Mother's brief at 17. Instead, the trial court recognized that the purported agreement between Mother and Father was merely the couple's expression of their continuing plan to pool their marital resources.

¶ 11 The context of Mother and Father's October 2004 discussions demonstrates that the discussions were not intended to create a legally binding contract between them. Instead, as highlighted below, the married couple was attempting to formulate a plan to ensure the children would have resources to pay for college.

¶ 12 During the evidentiary hearing, Mother testified that the alleged oral contract stemmed from a family discussion that occurred over dinner in October of 2004. N.T., 1/113/09, at 44–45. Mother testified that, with the children present, she and Father discussed how Father's return to work would enable her to retire.

*Id.* Later, while she and Father were alone cleaning the dishes, "Father approached [her] and made the agreement that ... we both had to work to put our four children through college because [Father] believed that he would not be able to go out and find a good enough job to be able to [support] the family ... beyond what [Mother's] pension would cover." *Id.* at 45–46. Thus, the alleged oral agreement was formed outside of the children's presence. *Id.* at 69. Mother explained that they both agreed to work and continue to pool their money so that they could pay the children's college expenses. *Id.* at 46. Mother further testified that the couple had subsequent incidental discussions about college expenses, but the marriage dissolved before either party acted upon their discussions and before Father attempted to find a job. *Id.* at 48–49.

¶ 13 Later, Mother testified that during December of 2007, she first advised Father that their oldest child, Kaitlyn, would be enrolling in the Art Institute of Pittsburgh, and she informed him of the expected costs. *Id.* at 49–50. She mailed Father a second letter during February of 2007, reminding him of his alleged obligation to contribute to the college expenses. *Id.* at 50. Mother testified that Father did not reply to her note; instead, Father's counsel mailed a note advising Mother that Father had no obligation to pay for the children's college education. *Id.* at 50.

¶ 14 During cross-examination, Mother reiterated that the post-dinner conversation culminated in an agreement that they would both work and continue to pool their income in order to pay the couple's living expenses. *Id.* at 79. Mother conceded that she did not contemplate the parties' divorce when the alleged agreement was created. *Id.* at 79–80, 87. She also assumed the couple would remain married,

cohabitating, and sharing household expenses. *Id.* at 80. Accordingly, the contemplated agreement between Mother and Father did not address any situations in which the parties would no longer share all of their expenses as a married couple. *Id.*

¶ 15 In addition, Mother explained the history of the alleged agreement, characterizing it as a "continual conversation" discussing ways to save money to pay for the children's college education. *Id.* at 83. Mother further conceded that she and Father never specifically addressed the terms of the alleged agreement. *Id.* at 85. In fact, Mother testified that she did not see a need to discuss terms to the agreement because, "We were a couple. We pooled everything. We had one source of funds. Everything comes out of that source of funds." *Id.* Accordingly, beyond continuing to pool income, the parties did not establish an amount each parent would contribute or devise a formula to determine the percentage each would pay. *Id.* at 85–87. The parties never negotiated the definition of college expense, the duration of the alleged obligation, or whether they would pay for the children's advanced degrees. *Id.* at 88. While Mother subsequently testified, on redirect-examination, that the alleged agreement to pay for the children's college education was not contingent upon the parties' staying married, the sum of Mother's testimony established that the premise underlying the parties' October 2004 discussion was that the parties would continue to pool their income. *Id.* at 117, 85, 86, 87.

¶ 16 Although Mother presented the parties' daughters, Kaitlyn and Jocelyn, as witnesses, their testimony did not advance Mother's position. Kaitlyn testified that Father never told her about the alleged agreement to pay for college. *Id.* at 124. Similarly, Jocelyn testified that she recalled the family discussion in October of 2004 at the dinner table, but she was not present when Father allegedly agreed to pay for her college. *Id.* at 125–26, 127. However, she testified that Father implied he would return to work to pay for her college education. *Id.* at 127.

¶ 17 Father also testified about the alleged oral contract to pay for the children's college expenses. Father testified that the only agreement he entered with Mother was that she would continue to work and not retire. *Id.* at 161–62. Father did not agree to pay for college during the October 2004 discussion. *Id.* at 162. He simply stated, "if the kids wanted to go to school, we're both going to have to be working." *Id.* That is, they would have to continue to pool their income to pay the family's living expenses. *Id.* at 163.

¶ 18 In light of the foregoing, the record belies Mother's assertion that Father entered into an oral contract and assumed responsibility to contribute to the children's college education. At most, Mother established that, while the parties were married, the couple engaged in ongoing conversations about different ways to pay college expenses. At that time, Mother and Father both envisioned working and continuing to pool their income in order to pay their living expenses and save for college. These expressions of the couple's intentions regarding household finances do not constitute a binding oral contract. Thus, no relief is due.

¶ 19 Having found that Father was not contractually bound to contribute to Kaitlyn's college expenses, we also reject Mother's contention the trial court erred in failing to award her counsel fees pursuant to 42 Pa.C.S. § 2503 because of Father's inaction. Accordingly, we affirm the trial court's January 26, 2009 order, wherein it denied Mother's Petition to Enforce Agreement and her request for counsel fees.

¶ 20 Mother's remaining issues relate to the January 22, 2009 child support order, wherein the trial court reduced Father's monthly child support obligation to $810.00. Essentially, Mother challenges the trial court's calculation of her and Father's net monthly incomes for purposes of determining their child support obligations, and she argues that the trial court failed to allocate support for the children's additional expenses. For the following reasons, we reject all three of Mother's assertions.

¶ 21 Child and spousal support "shall be awarded pursuant to statewide guidelines." 23 Pa.C.S. § 4322(a). In determining the ability of an obligor to provide support, the guidelines "place primary emphasis on the net incomes and earning capacities of the parties[.]" 23 Pa.C.S. § 4322(a). *See also Woskob v. Woskob*, 843 A.2d 1247, 1251 (Pa.Super.2004) (finding that "a person's support obligation is determined primarily by the parties' actual financial resources and their earning capacity"). An award of support, once in effect, may be modified via petition at any time, provided that the petitioning party demonstrates a material and substantial change in their circumstances warranting a modification. 23 Pa.C.S. § 4352(a). The burden of demonstrating a "material and substantial change" rests with the moving party, and the determination of whether such change has occurred rests within the trial court's discretion. *Plunkard v. McConnell*, 962 A.2d 1227, 1229 (Pa.Super.2008). The trial court must consider all pertinent circumstances and base its decision upon facts appearing in the record which indicate that the moving party did or did not meet the burden of proof as to changed conditions. *McClain v. McClain*, 872 A.2d 856, 863 (Pa.Super.2005).

¶ 22 On May 5, 2008, Father filed a petition for modification in light of Kaitlyn's eighteenth birthday on February 20, 2008, and in anticipation of her graduation from high school in June of 2008. Father also alleged that his estimated earning capacity of $4,116 per month greatly exceeded his actual earnings and that Mother's income had increased. In reducing Father's monthly support obligation from $1,094 to $810, the trial court considered Father's actual income earned working as a manager at a retail paint store in Alabama rather than his earning capacity as a sales representative selling industrial water treatment systems. On appeal, Mother argues that the trial court erred in failing to continue to utilize Father's earning capacity because Father failed to attain appropriate employment.

¶ 23 This Court has defined a person's earning capacity "not as an amount which the person could theoretically earn, but as that amount which the person could **realistically** earn under the circumstances, considering his or her age, health, mental and physical condition and training." *Gephart v. Gephart*, 764 A.2d 613, 615 (Pa.Super.2000) (citation omitted) (emphasis supplied). In rejecting Mother's argument that Father was underemployed, the trial court made credibility determinations in Father's favor. Specifically, the trial court reasoned,

Father testified credibly relative to his efforts to find other employment, and Father's expert witness also testified credibly concerning the multiple problems with Father returning after sixteen years to employment related to water treatment systems. Were the economy in general and the construction and retail sectors in particular not suffering in today's market, we believe Father might be earning $63,523 per year gross in retail employment in a "higher management position." ... Given "today's market," we find that Father has not

willfully failed to obtain appropriate employment (*See* Pa.R.C.P. No.1910.16–2(d)). Based on Father's promotions since 2005 from driver to assistant manager, and now to manager, we also find that Father is using his best efforts to maximize his income. Therefore, our decision not to attribute him with an earning capacity greater that his actual earnings is correct.

T.C.O. at 9.

 ¶ 24 The record supports the trial court's credibility determination.[3] During the evidentiary hearing, Father presented a vocational expert, Donal F. Kirwan. Mr. Kirwan is a forensic economist who evaluated Father's earning capacity for the period beginning with Father's move to Florida, and he reviewed Father's current employment. N.T. 1/13/09, at 10–11. In preparation for his evaluation, Mr. Kirwan reviewed: 1) Father's income tax returns; 2) a Social Security Statement dated February 17, 2006; 3) pay stubs from his current employer, Color Wheel Paint and Coverings ("Color Wheel") for the period between June 28 and July 26, 2008; and 4) a copy of a vocational assessment drafted by a third party on January 23, 2006. *Id.* at 12. Mr. Kirwan also reviewed Father's current résumé. *Id.* at 12–13.

¶ 25 Mr. Kirwan testified that during Father's final year working as a sales representative for a manufacturer of industrial wastewater treatment systems in 1992, Father earned $45,805. *Id.* at 16. However, Mr. Kirwan also testified that Fa-

ther's current prospects in industrial wastewater treatment are bleak, in part, because manufacturing has declined and partially, because Father has been out of the field since 1992. *Id.* at 16–17. Mr. Kirwan testified that Father would not be competitive with younger sales representatives in the field whom employers view as technically savvy. *Id.* at 17. Mr. Kirwan explained that, although Father has significant work experience in industrial wastewater management, his experience is dated. *Id.*

¶ 26 As it relates to Father's current career managing the paint store, Mr. Kirwan testified that Father started at Color Wheel as a sales associate and delivery driver in 2005, and he worked his way up to a store manager position in 2006. *Id.* at 17–18. As of September 2008, Father earned $41,535 per year managing the Color Wheel location. *Id.*

¶ 27 In sum, Mr. Kirwan did not believe that Father was underemployed in light of his thirteen-year absence from the workforce. *Id.* at 18–19. Mr. Kirwan noted that Father demonstrated initiative by accepting a low-level retail position and working his way up to store manager. *Id.* at 19. Mr. Kirwan continued that, as a re-entry employment candidate, Father's earning expectation would have been lower than a person with a steady work history. *Id.* Thus, at this point in his life, Father's most appropriate field of employment is in retail management. *Id.* at 21–22. However, Mr. Kirwan also testified that Father's age and the current market conditions are

---

**3.** Mother did not present any evidence concerning Father's earning capacity. On appeal, Mother argues that, pursuant to the law of the case doctrine, the trial court is bound by its prior assessment of Father's income for child support purposes. However, mindful of the trial court's unchallenged authority to modify child support orders based upon a material and substantial change in circum-

stances, that doctrine clearly does not control this issue. *See* 23 Pa.C.S. § 4352(a). Moreover, as Father accurately observed, "A party's income or earning capacity is a factual finding, not a legal conclusion or 'controlling legal rule of decision' that is fixed and immutable." *See* Father's brief at 30 (*quoting Ashbaugh v. Ashbaugh*, 426 Pa.Super. 589, 627 A.2d 1210, 1216 (1993)).

aligned against his finding a higher paying management position and he determined Father's current earning capacity as a retail store manager in the southeastern region of the United States to range between $37,000 and $41,000 per year. *Id.* at 23.

¶ 28 On cross-examination, Mr. Kirwan agreed that effort and motivation are important components of any search for employment. *Id.* at 25. He also agreed that Father could have hired someone to improve his résumé and to help him better explain his thirteen-year hiatus and identify marketable skills acquired during that time. *Id.* at 28–29. Mr. Kirwan also conceded that Father was currently earning $500 more than the earning capacity he had estimated in September of 2008. *Id.* at 30. However, on re-direct examination, Mr. Kirwan reiterated that Father's pursuit of employment within his prior field did not lack motivation or effort. *Id.* at 33–34.

¶ 29 Father's testimony during the evidentiary hearing corroborated Mr. Kirwan. Father testified that he has been actively searching for employment since the equitable distribution was resolved. *Id.* at 148. Father's ongoing search for employment includes reading the employment section of the local newspaper, responding to national Internet postings, and mailing résumés. *Id.* Father further testified that he has not limited his search to a particular industry. *Id.* at 149. He recently responded to two different positions in municipal wastewater treatment, but he found that he did not have the correct credentials for either position. *Id.* at 149–50. Father continues to look for a position in water treatment. *Id.* at 153. Although the focus of his previous employment in the field related to industrial wastewater treatment, he has pursued positions in municipal wastewater management in Florida because of an apparent dearth of industrial

facilities. *Id.* at 153–54. Father also explained that after retiring in 1992, he did not maintain the contacts that he had fashioned in the industry, in part, because he did not think he would ever return to that line of work. *Id.* at 154. In addition, Father observed that neither of his two prior employers from the Pittsburgh region still exists. *Id.* at 154–55. Father also explained that he could not afford to hire a professional job-placement service to assist him with his employment search or help him revise his résumé. *Id.* at 155, 181.

¶ 30 As it relates to his current earnings, Father testified that he began his employment with Color Wheel in Leesburg, Florida, as a sales associate earning an hourly wage with no opportunities for commissions or bonuses. *Id.* at 132, 137. That entry-level retail position was the only opportunity available to him at that time. *Id.* at 156. However, he currently manages a Color Wheel paint store located in Pelham, Alabama. *Id.* at 134. Father works between fifty-five and sixty hours per week managing the paint store. *Id.* at 135–36. As a manager, Father is eligible for bonuses, and Father received two quarterly bonuses during 2008. *Id.* at 137. Father currently earns $1,597.50 every two weeks. *Id.* at 141. In 2008, he earned approximately $41,000 in base salary, including his vacation compensation. *Id.* at 141, 185–86. In addition, he received $7,500 in bonuses and commissions in 2008. *Id.* at 141–42. Hence, Father believes that he made a reasonable effort to fulfill his employment potential, especially in light of his rapid advancement at Color Wheel and his continuing search for a higher-paying position. *Id.* at 173.

¶ 31 As the record supports the trial court's credibility determination, we will not disturb it. The trial court had the benefit of observing the witnesses and is

free to accept or reject that testimony. *See McClain*, 872 A.2d at 863 (stating that fact-finder is free to weigh the evidence presented and assess its credibility).

¶ 32 Next, Mother challenges the trial court's calculation of her net monthly income. The crux of this complaint is that the trial court substituted its intuition for the record evidence that she presented during the hearing. The following facts are relevant to our determination. During the evidentiary hearing, Mother introduced an exhibit ("Exhibit 17"), which outlined her net monthly income for purposes of the support guidelines. Mother's calculations established that her net monthly income was $10,843. However, in computing Father's guideline support obligation, the trial court calculated Mother's net monthly income to total $13,072.

¶ 33 The difference between the two figures is found in the method that Exhibit 17 portrayed Mother's federal income tax. Mother's exhibit utilized the basic standard federal income tax deduction totaling $8,350 in calculating her gross income; however, the trial court assumed that Mother would continue to itemize her deductions as she had done in the past. Thus, while Mother's Exhibit 17 artificially inflated her tax liability and therefore reduced her net monthly income by $2,229, the trial court utilized the itemized deductions Mother claimed on past tax returns. "With a house valued at $662,000 and a mortgage balance of $221,043 in 2006, Mother substantially reduces her tax liability by itemizing her deductions so that mortgage interest, real estate taxes, and state and local income taxes can be deducted." T.C.O. at 8.

¶ 34 Mother contends that the trial court abused its discretion in overlooking the figures she introduced into evidence and in adopting its own calculation. However, mindful that Mother traditionally claimed itemized deductions in her tax returns and that she did not present any evidence during the hearing to indicate that she, in fact, intended to discontinue claiming itemized deductions on her future tax returns, the trial court did not err in projecting Mother's tax liability for 2009 based upon the itemized deductions Mother claimed in the past. The trial court simply discounted Mother's thinly veiled attempt to disguise her actual income in order to increase Father's support obligation. Hence, no relief is due.

¶ 35 Mother also challenges the trial court's calculation of her net monthly income because it allegedly considered stock options that had not yet vested. Mother's brief at 26. Mother's assertion is predicated upon the premise that the stock options that the trial court considered had not vested. Mother alleges that, since the stock options are not scheduled to vest until between 2009 and 2011, their value is unknown and the trial court's attempted valuation was "pure speculation." *Id.* In contrast, Father argues that the "stock options" to which Mother refers were actually shares of restricted stock that had vested on January 12, 2009, one day before the evidentiary hearing. Father's brief at 29. Father points out that since Mother testified the restricted stocks would currently realize $14,000 if she elected to redeem them, their value is neither unknown nor speculative. *Id.* at 30.

¶ 36 The record supports Father's account. During cross-examination, Mother testified that following the parties' separation, she was granted three allotments of restricted stock in ALCOA, one of which matured on January 12, 2009. N.T., 1/13/09, at 88. Mother conceded she is now entitled to redeem the first allotment of that stock, and she estimated her gross proceeds would have totaled approximately $14,000. *Id.* at 90. As the record reveals

that an allotment of Mother's restricted stock vested prior to the evidentiary hearing and confirms that Mother now is entitled to redeem that allotment, the trial court did not err in including the value of the allotment of stock in computing Mother's income. *See MacKinley v. Messerschmidt*, 814 A.2d 680, 681 (Pa.Super.2002) (stating "once vested, stock options become accessible to a parent and so should be accessible to her children as well."). Thus, Mother's claim fails.

¶ 37 In her final issue, Mother argues that the trial court erred in failing to allocate additional child support to account for the increased costs of the children's "other needs" pursuant to Pa.R.C.P. 1910.16–6(d). Mother contends that since the trial court's previous support orders allocated support for the children's other needs, it was bound by the law of the case doctrine to continue to include these discretionary expenses in its support award. Accordingly, she requests this Court remand the matter with instructions for the trial court to include the children's additional expenses in its calculation of Father's child support obligation. Mother's brief at 30. For the following reasons, we deny Mother's request.

¶ 38 First, we reiterate our prior observation that the law of the case doctrine is inapposite where, as here, the trial court is addressing a petition for modification based upon a material and substantial change in circumstances. *See* 23 Pa.C.S. § 4352(a). Moreover, Mother's complaint is inaccurate factually. Contrary to Mother's assertion, the trial court did not neglect the children's additional expenses. Instead, the trial court addressed this precise claim in its Rule 1925(a) opinion and pointed out that the January 22, 2009 child support order included a twenty-five percent upward deviation from the child support guidelines to account for the chil-

dren's increased expenses. T.C.O. at 11. Significantly, the trial court found that the twenty-five percent deviation increased Mother's monthly child support award beyond what she would have received in proportionate reimbursement for the discretionary expenses she identified during the evidentiary hearing. *Id.* Thus, Mother's claim of error is unavailing.

¶ 39 For all of the foregoing reasons, we affirm the final child support order entered on January 22, 2009, wherein the trial court reduced Father's monthly child support obligation to $810.00, and we affirm the trial court's order entered on January 26, 2009, wherein the trial court denied Mother's petition to enforce the alleged agreement and denied her request for counsel fees.

¶ 40 Orders affirmed.