Gen. 33]                                                                  33

## CONSTITUTIONAL LAW

**EQUAL PROTECTION – FAMILY LAW – CONSTITUTIONALITY OF REQUIRING EQUITY COURTS TO RETAIN JURISDICTION OVER CHILD SUPPORT ORDERS WHEN CHILD IS ATTENDING COLLEGE OR OTHER POST-SECONDARY INSTITUTION**

December 22, 2017

*The Honorable Terri L. Hill, M.D.*
*House of Delegates of Maryland*

You have asked for our opinion on the constitutionality of proposed legislation that would require an equity court to retain jurisdiction over a child support order, after the child has reached age 18 and until age 23, when the child is enrolled at an institution that offers postsecondary education or vocational training. The proposed measure was introduced in the 2017 session of the General Assembly as House Bill 955. The bill, like similar bills introduced in earlier years, failed to make it out of committee.

One of the comments on the bill stated that it would treat similarly situated children between the ages of 18 and 23 differently depending on whether they are pursuing postsecondary education or whether their parents live apart. Because that comment suggested an equal protection concern, you have asked whether the measure, if enacted, would violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution either by treating adult children differently depending on whether their parents' marriage was intact, or by treating adult children in postsecondary education differently from adult children who are not pursuing education or vocational training after high school. We additionally address whether the proposed bill impermissibly treats parents differently depending on whether they are subject to an equity court's jurisdiction in a child support matter.

In our opinion, it would not violate the Equal Protection Clause to give equity courts the discretion to order a parent to support his or her child's pursuit of postsecondary education for a limited period after the child attains the age of majority.

**I**

**Background**

**A.  *The Current Law on Child Support Orders, for Educational Purposes, for Children Who Are over Age 18 and Enrolled in Secondary School***

Section 1-401(a)(1) of the General Provisions Article ("GP") provides generally that the age of majority is 18 years.  Except as otherwise provided by statute, an individual who is at least 18 years old is an adult "for all purposes and has the same legal capacity, rights, powers, privileges, duties, liabilities, and responsibilities that an individual at least 21 years old had before July 1, 1973." GP § 1-401(a)(2).  Section § 1-401(b) excepts from that rule individuals who have attained the age of 18 years and are enrolled in secondary school.  Those individuals have the right to receive support and maintenance from both parents until age 19, unless, before that, they die, marry, are emancipated, or graduate from or are no longer enrolled in secondary school.  GP § 1-401(b) ("high school exception").  As applied in child support proceedings, the age-of-majority provision means that an equity court may order the continuation of child support past the child's 18th birthday—the age of majority—and until the child's 19th birthday, while the child is enrolled in secondary school or other institution where he or she is working towards a high school diploma.  *See*, *e.g.*, *Richardson v. Boozer*, 209 Md. App. 1, 17 (2012).

Provisions like these were enacted after 1971, when the United States Constitution was amended to lower the voting age from 21 to 18 and many states followed suit by lowering their statutory age of majority.  An unintended consequence of lowering the age of majority had been that courts in some states could no longer order child support for a child over age 18, which meant that parents could stop supporting a child before the child had completed high school.  *See*, *e.g*., Leslie Joan Harris, *Child Support for Post-Secondary Education: Empirical and Historical Perspectives*, 29 J. Am. Acad. Matrim. Law 299, 315-16 (2017) (discussing the effect of the 26th Amendment on child support orders for the child's postsecondary education).

Maryland's adoption of a high school exception did not address the loss of equity courts' discretion to order child support for purposes of attending college or pursuing other postsecondary education.  Formerly, equity courts had held the authority to order, as part of a child support award, the payment of college tuition until the child turned 21.  *See*, *e.g*., *Smith v. Smith*, 227 Md. 355, 361

(1962) (upholding an order requiring the non-custodial parent to contribute to the cost of the education of his 19-year-old son). And, by 1970, the Court of Appeals, following "[t]he modern trend of the appellate decisions in the United States generally," had adopted the principle "that a college education is a necessity if the station in life of the infant justifies a college education and the father is financially able to pay or contribute . . . ." *Rhoderick v. Rhoderick*, 257 Md. 354, 367-68 (1970). The lowering of the age of majority to 18 reversed that "modern trend." Now, under the current law, most students are disqualified from support for any substantial amount of time past high school.

## B. *The Proposed Revision of the Law*

House Bill 955 would have changed the current law in two ways. First, it would have moved the high school exception out of the age-of-majority provision in the General Provisions Article and into the Family Law Article, thereby narrowing its scope to family-law proceedings. It would also have revised that exception to explicitly require an equity court to "retain jurisdiction" over support orders for children attending secondary school. As under current law, the support would terminate when the child is married, is emancipated, graduates from or is no longer enrolled in secondary school, or turns 19.[1] You have not asked us to address this aspect of the bill.

Second, the bill would have required an equity court to retain jurisdiction over a support order for a child who has attained the age of 18 years and is enrolled for at least 12 credit hours per semester (or its equivalent) at a college, university, or other institution of postsecondary education or vocational training (collectively, "postsecondary education"). Any support ordered under that provision would terminate when the child marries, is emancipated, leaves school, or reaches age 23, whichever comes first. Although the bill would have required the equity court to retain jurisdiction, it would not have required the equity court to order support in any given case. Instead, the bill would have identified the factors that equity courts must apply when considering whether to award support for these individuals and in

---

[1] Current law and the version in the bill differ in that current law applies to all individuals who attain the age of 18 and are still in secondary school, while the bill would apply only where there is a custody or support case over which the equity court can "retain jurisdiction," typically as a result of divorce or a paternity adjudication.

what amounts. The factors included the parent's ability to pay—a factor also considered by the equity courts in *Smith* and *Rhoderick*, when the age of majority in Maryland was 21.

As a co-sponsor of H.B. 955, you testified before the House Judiciary Committee about the State's interest in the ability of children to pursue postsecondary education. You cited studies that show that students with postsecondary degrees generally qualify for more jobs and are better able to support themselves than students whose education stopped at the secondary level, and you stated that the legislation would rectify the effects, on child support orders, of the lowering of the age of majority. *See* 2017 Leg., Reg. Sess., Hearing Before the House Judiciary Committee on H.B. 955 (written testimony of Del. Terri L. Hill, M.D.).

According to the Fiscal and Policy Note for H.B. 955, at least nine states have adopted statutes that authorize equity courts to order parents to provide post-majority child support for postsecondary educational purposes. A tenth state *requires* equity courts to order such support.[2]

## C. Potential Constitutional Issues Raised in Comments on House Bill 955

The Maryland Judicial Conference opposed H.B. 955. Its memorandum to the House Judiciary Committee stated:

> This legislation results in the disproportionate treatment of children similarly situated as it provides for child support for children up to age 23, but only if they are pursuing post-secondary (college/trade school) education. It also seems to apply only to children over the age of 18 whose parents live apart, thus promoting inequity among children similarly situated. The Judiciary is concerned that this bill advocates an inconsistent standard for the issuance of child support orders.

2017 Leg., Reg. Sess., Hearing Before the House Judiciary Committee on H.B. 955 (written testimony of Suzanne D. Pelz, on

---

2 The nine states that have adopted statutes similar to Maryland's are Connecticut, Illinois, Iowa, Massachusetts, New Jersey, New York, Oregon, South Carolina, and Washington. The tenth state is Missouri.

behalf of the Maryland Judicial Conference, Feb. 22, 2017). The memorandum did not express a view on the constitutionality of the bill. In light of the reference to "disproportionate treatment" of "similarly situated" children, however, you asked us to review and update our earlier advice[3] on the constitutionality of postsecondary education child support measures and to issue an opinion on the subject.

## II

## Analysis

The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (The Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."). The Clause does not, however, "take from the States all power of classification." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979). Instead, the constitutionality of a statutory classification depends on which level of scrutiny applies to the statute and whether the classification passes master under the test for that level of scrutiny.

"At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citations omitted). The most exacting scrutiny—known as "strict scrutiny"—applies to "classifications based on race or national origin . . . and classifications affecting fundamental rights." *Id*. "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id*. So, to determine the level of

---

[3] Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Terri L. Hill (Mar. 6, 2017); Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Kathleen M. Dumais (Mar. 22, 2004); Letter from Robert A. Zarnoch, then-Assistant Attorney General, to Del. Paul Carlson (Feb. 10, 2000); *see also* Letter from Richard E. Israel, Assistant Attorney General, to then-Sen. Brian E. Frosh (Jan. 31, 2001) (explaining that, absent statutory authorization, "a court . . . cannot order a parent to support a healthy [adult] child").

scrutiny that a court would apply to a given law, one must identify "classes" of "similarly situated" people that the challenged law treats differently. *See id.* (explaining that the level of scrutiny depends on the type of classification involved); *see also*, *e.g.*, *Washington v. State*, 450 Md. 319, 342 (2016) (explaining that an equal protection claimant must first demonstrate that "the State treated him differently from a similarly situated individual").[4]

You ask about the permissibility of the two types of classification identified in the Maryland Judicial Conference's comments about the proposed legislation: adult children between the ages of 19 and 23 whose parents' marriage is intact versus those children whose parents are unmarried or separated, and adult children of that same age who are pursuing postsecondary education versus those who are not. We will also address a third classification—one that focuses on classes of *parents*, as opposed to classes of children. We raise that issue because the people who have challenged postsecondary education child-support measures on equal protection grounds have usually been the parents ordered to provide the support.

## A.   *The Permissibility of Distinguishing Among Adult Children Based on Their Parents' Marital Status*

First, the law would differentiate between adult children who are the subject of a child support order, and those whose parents are either married or supporting them voluntarily without a court order. In the discretion of the equity court, the first group would be eligible for child support past the age of majority and until age 23, if an equity court finds that the educational requirements are met and that the circumstances make an award appropriate under the specified factors. By contrast, child support for the second group would continue to fall within the discretion of the parents, who might or might not decide to support their child past the age of majority. The basis of the distinction between the groups is thus

---

[4] Neither Maryland's Constitution nor its Declaration of Rights contains an express equal protection clause. However, the Court of Appeals has "recognize[d] that the concept of equal treatment is embodied in the due process requirement of Article 24 [of the Maryland Declaration of Rights]." *Hornbeck v. Somerset County Bd. Of Educ.*, 295 Md. 597, 616 n.4 (1983). Maryland courts turn to "decisions of the Supreme Court interpreting the equal protection clause of the federal constitution [as] persuasive authority in cases involving the equal treatment provisions of Article 24." *Id*. at 640 (citations omitted).

the pre-existing involvement of the equity court on the question of parental support for the child.

The initial question is whether these two groups of adult children are "similarly situated"—that is, are they "in all relevant respects alike"? *See Nordlinger*, 505 U.S. at 10. We think not, at least in the constitutional sense. House Bill 955, as we read it, would merely have continued an equity court's jurisdiction over a child support matter; it would not have created new jurisdiction over a particular group and, thus, would not have created a new classification. *See* H.B. 955, proposed Family Law § 1-201(d)(1) and (2) (authorizing the equity court to "retain" jurisdiction for purposes of ordering support for a child attending secondary and postsecondary education). The circumstance of the equity court's involvement arises under the Family Law Article in all cases in which unmarried parents litigate child support, and it distinguishes those children from children whose support is not a matter for the equity court. *Cf. In re Kurowski*, 161 N.H. 578, 590 (2011) (explaining that the equity court's exercise of jurisdiction in child support matters when the parents disagree does not violate either parent's constitutional right to direct their child's upbringing); *Johnson v. Louis*, 654 N.W.2d 886, 891 (Iowa 2002) (stating that children "whose parents never sought State involvement to formalize or dissolve their relationships, are not similarly situated" to children who "have had the attributes of a legally recognized parental relationship taken from them by court decree"). In short, children whose parents' child-support obligations are already subject to the discretion of an equity court are not similarly situated to children whose parents' child-support obligations continue to lie within their own discretion.

Moreover, even if these two groups of children were deemed to be "similarly situated,"[5] the proposed extension of the equity

---

[5] Commentators have cited studies that show that the involvement of an equity court is not the only circumstance that would defeat the notion that adult children of an intact marriage and adult children of divorced or never-married parents are "similarly situated" with regard to the need for postsecondary support. *See* Scott Gelber, *Child Support Litigation and the "Necessity" of American Higher Education, 1920-70*, 54 Am. J. Legal Hist. 39, 66-67 (2014) ("Nearly 90 percent of married parents provide consistent assistance while their children attend college, compared to less than 30 percent of divorced parents. Divorce further complicates college access because financial aid offices often consider the income of both parents regardless of their willingness to contribute.

court's jurisdiction would only be subject to rational basis review. The classification would not be based on suspect criteria, such as race or national origin, and it would not implicate a fundamental right, such as the right to vote, so a court would not subject it to strict scrutiny. Further, the measure would not draw "discriminatory classifications based on sex or illegitimacy," so it would not be subject to intermediate scrutiny, either.[6] *See Clark*, 486 U.S. at 461 (applying intermediate scrutiny to "discriminatory classifications based on sex or illegitimacy"); *see also Morales-Santana*, 137 S. Ct. at 1700 n.25 (citing *Clark*) ("Distinctions based on parents' marital status . . . are subject to the same heightened scrutiny as distinctions based on gender."); *Gerhardt v. Estate of Moore*, 150 Wis. 2d 563, 574 (1989) (stating that, where the law disfavored illegitimate children, "[p]rohibiting nonmarital children involved in lump-sum child support settlements the ability to seek additional support, not denied marital children [involved in such settlements], amounts to a denial of the equal protection of the law").

To meet the rational basis standard, "a statutory classification must be rationally related to a legitimate governmental purpose." *Clark*, 486 U.S. at 461 (citations omitted). When a court conducts a rational basis review, "a statute is presumed constitutional and will be upheld if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Washington*, 450 Md. at 344 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

Most courts have found that a State's interest in furthering postsecondary education opportunities for children of divorced or unmarried parents easily qualifies as a "legitimate governmental purpose." *See*, *e.g.*, *McLeod v. Starnes*, 723 S.E.2d 198, 204 (S.C. 2012) ("As can hardly be contested, the State . . . has a strong interest in ensuring that our youth are educated such that they can become more productive members of our society."); *In re*

---

In part because of these factors, the children of divorced parents across all income levels are less likely to aspire towards, prepare for, and apply to institutions of higher education.").

[6] The proposed measure addresses "illegitimate" children of unwed parents, but it affords them the same protections available to the children of married parents. Because neither class is disadvantaged by the bill, it would not be subject to intermediate scrutiny on that basis. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1700 (2017) (stating that intermediate scrutiny would apply to the "[d]isadvantageous treatment of marital children in comparison to nonmarital children").

*Marriage of Vrban*, 293 N.W.2d 198, 202 (Iowa 1980) ("[W]e find the state has a legitimate interest in promoting higher education for its citizens. [The educational support statute] is rationally related to protecting that interest and does so in a manner that is neither arbitrary nor unreasonable."); *Childers v. Childers*, 89 Wash. 2d 592, 604 (1978) ("Even if the legislation does create a classification, it rests upon a reasonable basis. . . . The irremediable disadvantages to children whose parents have divorced are great enough. To minimize them, when possible, is certainly a legitimate governmental interest."); *In re Marriage of McGinley*, 172 Or. App. 717, 733-35, *review denied*, 332 Or. 305 (2001) (holding that educational support statute does not violate equal protection); *Kujawinski v. Kujawinski*, 71 Ill. 2d 563, 581-82 (1978) (same); *Donnelly v. Donnelly*, No. FA114115477, 2012 WL 3667312, at \*5 (Conn. Super. Ct., Aug. 1, 2012) (unreported) ("The promotion of higher education and the protections afforded to children of divorced parents, who are less likely to receive financial support for college education than children of intact parents, are certainly legitimate government interests.").

Nonetheless, the Supreme Court of Pennsylvania reached a different conclusion on the legitimacy of a state's interest in post-majority child support for higher education. In 1995, after finding the two groups of adult children to be "similarly situated" because both "need[ed] funds for college education," that court questioned "whether the legislature actually has a legitimate interest in treating children of separated, divorced, or unmarried parents differently than children of married parents with respect to the costs of post-secondary education." *Curtis v. Kline*, 542 Pa. 249, 257-60 (1995). The court thus framed the question to focus the inquiry on the state's interest in *unequal treatment* as opposed to the state's interest in providing educational support for adult children of divorced or unmarried parents. The court then found "no rational reason" why the two groups "should be treated unequally" and found the statute unconstitutional. *Id*. at 260. The dissenters focused the inquiry instead on the statutory goal of "furthering the education of the citizens of this Commonwealth," cited studies showing that children whose parents are not married receive less parental support than children of intact families, and observed that courts usually defer to legislative findings when a classification does not merit strict scrutiny. *Id*. at 261-66. Noting Pennsylvania's support of its state university system and other postsecondary training, the dissent also stated that "[i]t cannot successfully be argued that the state has no legitimate interest in furthering the education of its citizens." *Id*. at 266.

Other courts have not adopted the approach taken by the majority of the Pennsylvania court in *Curtis*. Indeed, that approach is hard to square with the deferential "rational basis" standard of review. Specifically, we do not think that a reviewing court would question a legislative finding about the disparities in postsecondary support for the two groups of adult children; if anything, since 1995, there have been more studies on the subject for Maryland's Legislature to consider, and its findings would be accorded deference. *See*, *e.g.*, *City of Cleburne*, 473 U.S. at 440 ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, . . . and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (internal citations omitted)). Very likely, a court would find that the measure proposed by H.B. 955 is directed at a "legitimate governmental purpose."

The final step in a rational basis review is to analyze whether the measure is "rationally related" to the legitimate governmental purpose. That standard simply means that the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. Here, there is a direct relationship between the remedial goal of the proposed legislation and its application only to parents involved in child support cases. As noted by the *McGinley* court, "it is rational to believe that children from non-intact families will have more difficulty paying for their college education than will children from intact families, in part because of lack of support from divorced parents." 172 Or. App. at 727. You testified that a goal of the statute is to help this particular disadvantaged population overcome the disadvantages caused by the marital status of its members' parents. 2017 Leg., Reg. Sess., Hearing Before the House Judiciary Committee on H.B. 955 (written testimony of Del. Terri L. Hill, M.D.). In our opinion, the proposed measure—particularly if supported by findings— would meet the standard set by the rational basis test.[7]

---

[7] We can envision specific circumstances in which the proposed measure's focus on *retaining* jurisdiction—as opposed to *assuming* jurisdiction in the first instance—might mean that it does not solve the entire problem that prompted its introduction. For example, the proposed measure would not reach a child who turns 18 *before* his parents' divorce because the equity court would not have any jurisdiction to retain. The same gap in the equity court's jurisdiction would occur if a child takes two years off after high school before attending college. These gaps in the proposed measure's reach, however, would not be fatal

In summary, most courts have upheld laws that authorize post-majority child support for postsecondary education. *See*, *e.g*., *McGinley*, 172 Or. App. at 734 ("[T]he state has a legitimate interest in having an educated populace, and requiring divorced parents to contribute to their children's education is a rational means of furthering that interest."); *see also In re Marriage of Grittman*, 730 N.W.2d 209 (Iowa 2007) (gathering cases). We think it unlikely that a court reviewing the grant of such authority to an equity court in Maryland would invalidate the proposed measure on a theory that it impermissibly discriminates against adult children of intact marriages.

## B.  *The Permissibility of Distinguishing Among Adult Children Based on Whether They Are Pursuing Postsecondary Education or Training*

The measure would also seemingly treat differently two groups of adult children under age 23 who are the subject of a child support order—on the one hand, those who are pursuing postsecondary education and, on the other, those who are not pursuing training or education past the secondary level. The former group would remain under the equity court's jurisdiction and qualify for child support; the latter would not. The proposed differentiation does not draw distinctions based on suspect factors of race, national origin, or on factors involving fundamental rights. The law thus would not involve a protected class for whom a less-favored treatment would trigger strict scrutiny. The law also does not distinguish on the base of sex or illegitimacy, so it would not even be subject to intermediate scrutiny. Instead, the "rational basis" level of scrutiny would apply, and so the inquiry would again be whether the distinction was "rationally related to any legitimate state interest." *Washington*, 450 Md. at 342.

As discussed above, we have little doubt about the legitimacy of the State's interest in furthering the pursuit of postsecondary education by children whose child support falls within the jurisdiction of an equity court. Further, the distinction between these two groups is "rationally related" to that interest, and, in fact, directly tailored to it: an equity court would retain jurisdiction only for educational purposes. We have found no case in which a plaintiff challenged a post-majority education child support law on

---

to its constitutionality. A statute survives rational basis review even if it does not address all aspects of a problem. *See Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 466 (1981).

the theory that it discriminated against adult children not in pursuit of further education or training.

### C.   The Permissibility of Distinguishing Between Parents Who Are Subject to an Equity Court's Jurisdiction for Child Support Matters and Those Who Are Not

The bill makes a third distinction, between married parents (who would retain the discretion to support their children during postsecondary education) and divorced or unmarried parents who could be ordered to provide such support. The claim that postsecondary education child support statutes violate equal protection by treating intact families differently than other families has been almost universally rejected, whether because parents under an equity court's jurisdiction are not "similarly situated" to those who are not, or because the distinction met the applicable standard of scrutiny. In *Vrban*, the Supreme Court of Iowa found such a claim deficient for both of those reasons:

> The respondent argues that divorced parents are arbitrarily ordered to support their adult children in order to accomplish this state purpose [of education] while no similar requirement is imposed upon married parents. However, this does not necessarily make the classification arbitrary or unreasonable. The statute was designed to meet a specific and limited problem, one which the legislature could reasonably find exists only when a home is split by divorce.
>
> The legislature could find, too, that most parents who remain married to each other support their children through college years. On the other hand, even well-intentioned parents, when deprived of the custody of their children, sometimes react by refusing to support them as they would if the family unit had been preserved.
>
> The legislature could consider these facts and decide there is no necessity to statutorily require married parents to support their children while attending college but that such a requirement is necessary to further the state interest in the education of children of divorced parents. The differences in the circumstances between married and divorced

> parents establishes the necessity to dis-
> criminate between the classes.  The statute is
> neither arbitrary nor unreasonable.

293 N.W.2d at 202 (citations omitted); *see also Kurowski*, 161 N.H. at 590 (explaining that the equity court's exercise of jurisdiction in a child-support matter when the parents disagree does not violate either parent's right to equal protection).[8]

Most other courts have agreed that post-majority child-support statutes for educational purposes do not violate a parent's right to equal protection.  *See*, *e.g*., *Childers*, 89 Wash. 2d at 601-02 ("If an absolute duty of support for such a purpose were imposed on divorced parents, there would perhaps be an unreasonable classification. Instead, what exists is the long standing special powers the courts have had (in equity, regardless of legislation) over the children of broken homes to assure that their disadvantages are minimized."); *Neudecker v. Neudecker*, 577 N.E.2d 960, 962 (Ind. 1991) (rejecting the "claim that equal protection rights are violated because a divorced parent can be ordered to pay for his child's education, while a married parent may unilaterally refuse to do so").  The Illinois Supreme Court, for example, had "no hesitation" in concluding that a statute permitting the trial court "to compel divorced parents to educate their children to the same extent as might reasonably be expected of nondivorced parents" was reasonably related to the state's legitimate purpose of "minimiz[ing] any economic and education disadvantages to children of divorced parents."  *Kujawinski*, 71 Ill. 2d at 580; *see also McLeod*, 723 S.E.2d at 206; *McGinley*, 172 Or. App. at 734;

---

[8]   The *Kurowski* court stated:

> [I]n the context of a divorce, the trial court has the authority to adjudicate disputes between two fit parents involving parental rights in accordance with the child's best interests.  Because the parents in this case reached an impasse on the exercise of their respective parenting rights, the trial court properly utilized the best interests standard to resolve the dispute.  The trial court's decision is not subject to strict scrutiny review merely because the case involves the fundamental parental right to make decisions for daughter's education and the parents' divergent religious convictions.

> Our decision is consistent with that of many other courts.

161 N.H. at 590 (citations omitted).

*In re Marriage of Kohring*, 999 S.W.2d 228, 233 (Mo. 1999); *McFarland v. McFarland*, 885 S.W.2d 897, 899-900 (Ark. 1994); *LeClair v. LeClair*, 137 N.H. 213, 223-24 (1993). In reaching that conclusion, courts have generally rejected the notion that the payment of post-majority child support implicates a fundamental right that would trigger strict scrutiny. *Kohring*, 999 S.W.2d at 232 ("[T]he jurisdictions that have considered [the question] have held uniformly that a parent has no fundamental right to avoid providing support for his or her children past age eighteen."); *Neudecker*, 577 N.E.2d at 962 ("The expenses of college are not unlike those of orthodontia, music lessons, summer camp, and various other optional undertakings within the discretion of married parents but subject to compulsory payment by inclusion in a child support order in the event of dissolution. The statutes which authorize such orders do not infringe upon fundamental child-rearing rights.").

The Supreme Court of Florida reached a different result in *Grapin v. Grapin*, concluding there that any "duty" to assist one's adult children in obtaining a higher education "is a moral rather than a legal one." 450 So.2d 853, 854-55 (Fla. 1984). As a result, "[i]t would be fundamentally unfair for courts to enforce these moral obligations of support only against divorced parents while other parents may do as they choose." *Id*. at 854. The court did not, however, analyze whether parents involved in child support proceedings are "similarly situated" to parents who are either in an intact relationship or in agreement on child support.

As explained by *Vrban* and *Kurowski*, parents involved in child support proceedings are not "similarly situated" to parents whose support of a child is not the subject of such a proceeding. Moreover, as discussed above, the distinction is not only rationally related to a legitimate purpose, as required under the rational basis test, but also "substantially related to an important governmental objective," as would be required to meet intermediate scrutiny. *Clark*, 486 U.S. at 461. It is, therefore, our view that the bill would not impermissibly differentiate between these two groups of parents.

## III

## Conclusion

In our opinion, the legislation that was proposed in the 2017 legislative session as H.B. 955 would not violate the equal protection rights of either the adult children or the parents who would be affected by it. As discussed above, to the extent that the legislation could be viewed as treating classes of "similarly

situated" individuals differently, those classifications would be subject to review for whether they are rationally related to any legitimate state interest. Particularly if the legislation were to include legislative findings on the State's interest in objectives such as an educated workforce and the provision of educational opportunities to children of divorce to address the disadvantages they experience in that regard, it would easily withstand that review. *See*, *e.g.*, *Kujawinski*, 71 Ill. 2d at 579 (noting the "express purpose" of Illinois's post-majority child support statute to "mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage").

Brian E. Frosh
Attorney General of Maryland

Ann MacNeille
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice